**James E. CLATTERBUCK, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**Misc. No. 1006.**

United States Court of Appeals
District of Columbia Circuit.

Oct. 30, 1958.

On Motion for Appointment of Counsel
March 26, 1959.

James E. Clatterbuck, pro se.

Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher and John W. Kern, III, Asst. U. S. Attys., Washington, D. C., for appellee.

Before PRETTYMAN, Chief Judge, and EDGERTON, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, in Chambers.

PER CURIAM.

### Order

Upon consideration of petitioner's petition for rehearing in banc of his application for leave to proceed on appeal in forma pauperis, it is

ORDERED by the court that the petition for rehearing in banc be, and it is hereby, denied.

\* \* \* \* \* \*

Circuit Judge WILBUR K. MILLER would grant the petition for rehearing in banc.

Circuit Judge BAZELON would grant the petition for rehearing in banc and files a statement in relation thereto.

Circuit Judge WASHINGTON voted against a rehearing in banc and files a statement in relation thereto.

Statements of Circuit Judges BAZELON and WASHINGTON in Relation to Petition for Rehearing in Banc.

\* \* \* \* \*

BAZELON, Circuit Judge.

A division of this court denied petitioner's application for leave to appeal in forma pauperis from the District Court's denial, after hearing, of his motion to vacate sentence under 28 U.S.C. § 2255. He now seeks rehearing in banc.

Petitioner was represented by counsel at the hearing below, but was without counsel when he prepared and filed his motion to vacate, his application to this court for leave to appeal in forma pauperis, and the present petition for rehearing in banc.

The following is a summary of the circumstances which provoke my disagreement with the court's action in this case. These circumstances cast grave doubts upon the validity of the proceedings which thrust petitioner into a penitentiary and kept him there despite gross manifestations of a continuing mental illness:

1. Petitioner, who had a history of mental illness dating back at least to 1942, had escaped from a mental institution one week prior to the date of the offense charged.

2. He was found incompetent to stand trial.

3. Later, at the hearing upon the Government's motion for a determination of restored competency, he was denied leave to proceed without prepaying costs, and denied leave to secure, at Government expense, a transcript of the original competency proceeding and psychiatrists to testify in his behalf.

4. Several post-trial mental examinations confirmed the earlier determinations of psychiatrists that petitioner was psychotic. The Jail classification report stated that, although psychiatric examinations indicated that appellant "is mentally sound," "his behavior [is] \* \* \* that of a completely deranged person."

5. On September 15, 1955—about a year after petitioner's conviction—the Government dismissed the petition for a civil lunacy hearing which it had previously filed. But in the same month the Chief of the Division of Legal Psychiatric Services filed a report concluding that petitioner was a schizophrenic who would lie under his bed, smear himself with and eat his feces and urine; and who would imagine himself surrounded by spirits and constantly speak of trying to kill people.

6. Counsel appointed for petitioner at trial filed a notice of appeal in his behalf, but let the appeal be dismissed for stated reasons which are incomprehensible to me. It does not appear that petitioner asked counsel to drop the appeal or that petitioner was advised that he could renew his forma pauperis petition in this court after it had been denied by the District Court. Now pending on appeal is a District Court order suspending that counsel from practice for not answering charges of failure to prosecute a case for another client.

7. Petitioner became eligible for parole in November 1956, at which time he was undergoing an examination at St. Elizabeths Hospital. His parole application, heard on March 13, 1958, was denied. His "good time" automatic release date is April 22, 1959. If his bizarre behavior is viewed as symptomatic of mental illness, the prison authorities could not conscionably regard it as bad conduct and he would therefore be released on that date. But since petitioner has been incarcerated in a penitentiary rather

than treated in a hospital, it is clear that the Government does not consider him to be ill and that he will be confined in prison until his full term expires on May 22, 1960.

Up to now the prison authorities have classified petitioner as a disciplinary problem. If they should now reclassify him as a medical problem—after having known all about his condition for the past four years of his incarceration—the question would arise whether such reclassification would merely be a device to extend petitioner's custody under § 4241 of Title 18 U.S.C., discussed *infra,* or under § 4247 of Title 18 U.S.C. The latter section provides, in substance, that a prisoner may be held even after the expiration of his sentence if he " * * * is insane or mentally incompetent, and that if released he will probably endanger the safety of the officers, the property, or other interests of the United States, and that suitable arrangements for the custody and care of the prisoner are not otherwise available * * *." It may be that even now, on the eve of petitioner's release, the prison authorities may validly extend his commitment by hospitalizing him under § 4247 or under any of the other procedures described in Judge Washington's statement herein. But the disturbing question would always

remain: Why did the prison authorities fail to take steps to hospitalize petitioner long before this? The answer to that question is of critical importance, it seems to me, to society's interest in the proper treatment of offenders, particularly as it relates to its own safety.

Suffice it to say that, under the Government's long insistence that petitioner is not mentally ill, we can expect that in May 1960, at the *latest,* the Government will release into the community a man who has received no treatment during his incarceration and of whom one psychiatrist has said, "Almost certainly he will make sexual attempts and perhaps even kill little girls again."

Because the foregoing matters raise critical questions affecting the administration of criminal justice, I shall undertake to detail the underlying facts.

Petitioner was indicted on August 31, 1953, for taking indecent liberties on August 1, 1953, with a nine-year-old child. Counsel,[1] appointed by the court, sought a judicial determination of petitioner's competency to stand trial. His petition stated, *inter alia,* that on November 30, 1942, petitioner was found by by the District Court to be of unsound mind and was confined to St. Elizabeths Hospital until May 20, 1948,[2] and fur-

1. Appointed counsel was later suspended on March 21, 1958, for twenty days, as a member of the bar of the District of Columbia for professional misconduct based on his failure to answer charges of the Grievance Committee of the Bar, arising out of a complaint by one Mitchell who was convicted on narcotics charges. Mitchell alleged that, although he paid counsel a fee in full of $250, counsel failed to confer with him or his family and did nothing to promote his interest. The suspension is now on appeal in this court. In re: James Franklyn Bourne, No. 14451.

2. That petitioner was confined to St. Elizabeths from November 30, 1942 to May 20, 1948, is confirmed by the District Court file in Clatterbuck v. Overholser, Habeas Corpus No. 3361 (1948). His release was effected under the following circumstances: On April 5, 1948, he filed a *pro se* handwritten application for writ

of habeas corpus in the District Court. The application is quoted verbatim as follows:

"In the name of the United States plaintif prayer to the Hon. United States District Court for the District of Columbia Washington DC. for pourper Writ of Habeas Corpus must subspend the Body of James E. Clatterbuck, CT Ward for the Wholesale purpose to sue Superintendent Winfred Overholser for the plaintiff re lease from the Hospital the plaintif mind Health is good the plaintif has suffered in the lock Wards illegial for all the since plaintif ever Comitt Where as my intention is to Work earn a living pay tax Vote he a good Citizen and Gentleman Where as the plaintif prayer to the Hon said Court District of Columbia I No # 50115 and the amendment as provides plaintif is a pourper With Out founds to pay for attorney or the Court but according to Law and the Constitution my Health

ther, that counsel was advised that during January 1949 petitioner had been committed to Western State Hospital, Staunton, Virginia, and had escaped from that institution on or about July 27, 1953, exactly one week before the date of the crime involved here. On November 20, 1953, the District Court, after a hearing held pursuant to 18 U.S.C. § 4244, ordered petitioner committed to St. Elizabeths Hospital upon a finding that he was of unsound mind.[3]

On May 25, 1954, the Superintendent of St. Elizabeths advised the court that petitioner "is at this time mentally competent to stand trial and is able to consult with counsel and properly assist in his own defense." The Government then moved the District Court for a determination of restored competency. Gunther v. United States, 1954, 94 U.S.App.D.C.

243, 215 F.2d 493. On July 21, 1954, petitioner, through his counsel, applied for leave to proceed without prepayment of costs, specifically without payment of "necessary costs of defense such as competent mental examination," and for a transcript of the proceedings had upon the original competency hearing.[4] On September 1, 1954, this application was denied *without argument,* and petitioner was thereupon found competent to stand trial.[5] It was only *after* this determination was made—on September 22—that he was allowed to proceed without prepayment of costs.

Upon a jury trial before Judge Letts, petitioner was convicted and sentenced to a term of two to six years, without a recommendation as to place of confinement.[6] He was subsequently committed

mind good Where as I being held illegial against my will my prayer is to be restored to my legial Constitution Wrights by my hand I swear this statement truth before God

"Respectively

"/s/ James E. Clatterbuck"

The answer of the Superintendent of St. Elizabeths asserted that petitioner "is of unsound mind, suffering from Psychosis with Psychopathic Personality, and that the petitioner is still of unsound mind and in need of further hospital care."

After a hearing, Judge Holtzoff referred the matter to the Commission on Mental Health for the District of Columbia. The Commissioners filed a report on May 7, 1948, stating that although petitioner "has a long history of anti-social behavior and even presently, expresses many hypochondriacal ideas and unless given sedation becomes a serious conduct problem," they were of the opinion that he was a "Psychopathic Personality without Psychosis at this time." A supplemental report stated: "However, he is a Psychopathic Personality addicted to the use of barbiturate drugs, and we suggest that consideration be given to his transfer to the Federal Narcotic Farm, Lexington, Kentucky, or that he be placed under the strict supervision of a private physician."

Judge Holtzoff ordered petitioner released and restored to legal status on May 21, 1948.

3. Dr. Amino Perretti and Dr. Gerhart Gordon, the psychiatrists appointed to examine petitioner, both reported to the court that petitioner was of unsound mind, suffering from a "frank mental disorder of psychosis."

4. In its answer to the application, the Government objected on the ground that "it is not believed that Section 18 U.S.C. § 4244 contemplates a free rein to defendant by the device of procedure in forma pauperis to call psychiatrists of his own choosing or to have examinations other than those provided for in this case. The defendant has already had the service of two psychiatrists appointed by this Court on the original hearing and has had the further benefit of examination by the psychiatrists of the staff of Saint Elizabeths Hospital." Significantly, these court appointed psychiatrists testified that petitioner was incompetent to stand trial.

See Gunther v. United States, 1954, 94 U.S.App.D.C. 243, 245, 215 F.2d 493, 496, for discussion concerning the character and scope of a hearing to determine restored competency.

5. A hearing on the issue of petitioner's competency to stand trial was conducted, at which the testimony of two psychiatrists from St. Elizabeths Hospital was received.

6. The sentencing judge failed to make a recommendation, despite the pre-sentence report, which stated:

by the Prison Bureau to Lorton Reformatory, notwithstanding the statement of the Department of Corrections Assignment Board that it "most strongly recommends * * * a hospital type institution for care and treatment." [7]

On December 3, 1954, nine days after entry of judgment, petitioner filed a notice of appeal with the District Court. On the same day, that court denied leave to appeal in forma pauperis, with the notation "The court is aware of no substantial question of law. The court further finds that the appeal is not taken in good faith." Petitioner did not renew his forma pauperis application here, but instead docketed his appeal. However, the appeal was dismissed on December 21, 1954, when his counsel failed to answer an order to show cause why the appeal should not be dismissed for failure to file the record.

On December 26, 1954, petitioner addressed a letter to this court requesting a transfer from Lorton Reformatory to St. Elizabeths Hospital. Our late Chief Judge Stephens then requested petitioner's counsel, the Assistant United States Attorney who prosecuted the case, and the two judges who had participated with him in the order dismissing the appeal, to attend an informal conference in his chambers to discuss the case. Our Clerk's diary indicates that at this conference the following transpired:

Mr. Bourne [petitioner's counsel] explained that certain doctors from St. Elizabeths had testified at trial that appellant was a neurotic who is in the category requiring hospitalization. The doctors advised counsel that appellant is the type of person who will continue to create a disturbance in society but that appellant is legally responsible for his conduct. That the history of appellant's time in institutions was of continued disturbance and the doctors thought this was the result of studied conduct. Mr. Bourne also discussed with the Assistant United States Attorney the question of whether or not appellant should be committed under the Miller Act [D. C.Code 1951, § 22–3501 et seq.] as a sexual psychopath. However, they (Lewis Carroll and Samuel L'Hommedieu, Jr. [Assistant United States Attorneys]) were of the opinion appellant should be in jail. Appellant has made this complaint of a heart condition since 1942 and whenever he is in jail he requests that he be transferred to a hospital. In response to a question by Judge

"He appears to be a person who could be classified as a sexual psychopath under the meaning of the sexual psychopath law, but in view of his extended periods of treatment in mental hospitals, it does not appear likely that he would profit from that type of treatment. He will undoubtedly be a problem in any institution where he is placed but it appears to us that an institution such as a Medical Center for Federal Prisoners might be the best placement for him."

7. Petitioner had been taken to the District of Columbia Jail for classification. The classification report indicated not only that petitioner had escaped from a mental institution one week before the date of the offense charged, but that he had had a long history of maladjustments at home and prolonged commitments to mental institutions, and that during the period of his detention between arrest and conviction he had been a constant source of trouble, requiring placement in special isolation cells. The report concluded with the comments:

"Although the results of psychiatric examinations in the case of Clatterbuck appear to indicate that he is *mentally sound*, his personality projection into a world of unreality and the detachment of himself from his physical surroundings are so complete and fantastic that his behavior has become perpetually that of a *completely deranged person*. There is no question in the minds of the members of the Assignment Board about the inability of this inmate ever to make a satisfactory adjustment in a penal type institution. The Assignment Board most strongly recommends that this man be transferred to a hospital type institution for care and treatment." [Emphasis supplied.]

Prettyman, Mr. Bourne stated that he did not follow through on the appeal because after questioning several witnesses and at the end of the Government's case defendant's counsel moved to dismiss on the grounds that the Government had not proved sanity. The trial judge ruled that since counsel for appellant had not made an opening statement, Government counsel did not need to prove affirmatively that defendant was sane. That the defense of insanity at the time of the commission of the offense was made but the jury convicted. The trial judge denied motion for leave to proceed on appeal in forma pauperis.

Thereafter, this court took no action except to direct our Clerk to communicate with the United States Attorney, calling his attention, in light of petitioner's letter, to the applicability of 18 U.S.C. § 4241. That section provides for a board of examiners for each Federal penal institution and directs that each board examine "any inmate of the institution alleged to be insane or of unsound mind or otherwise defective and report their findings * * * to the Attorney General," who may then direct the official having custody of the prisoner to remove him to "any * * * institution authorized by law to receive insane persons * * * convicted of offenses against the United States" until sanity is restored or the maximum sentence is served. The case was then referred by the United States Attorney to the Division of Legal Psychiatric Services, which examined petitioner and recommended that he be transferred to a mental institution. At this point the Government instituted civil lunacy commitment proceedings in the District Court but dismissed them on September 15, 1955.[8] Petitioner was taken to St. Elizabeths for examination in October 1955, but was returned to Lorton on November 6, 1956.[9]

8. Examinations were made in June and July 1955. Dr. Manley Root, one of the psychiatrists who examined petitioner, reported:

"I give as my opinion that the man is certainly psychotic and almost surely suffering from the kind of schizophrenia called hebephrenia * * *. This man is psychotic and has been so for years and should be taken care of from a psychiatric rather than a custodial and disciplinary status * * *. It must be remembered, of course, that this man is a terrible menace to children because of his sexual peculiarities, and certainly steps should be made, if possible, that he does not ever have the privilege of associating with the general population of this country. Almost certainly he will make sexual attempts and perhaps even kill little girls again. If it is impossible to have him sent to a psychiatric hospital for any reason, then certainly for the protection of society he should be kept in prison for the maximum possible period of time."

On July 25, 1955, the United States Attorney filed a petition for a lunacy inquiry, pursuant to Title 24, §§ 301–302, D.C.Code, attaching to the petition an affidavit of Dr. Thomas Griffin, Chief of Legal Psychiatric Services, which gave as his opinion that petitioner was of unsound mind, suffering from schizophrenic reaction, chronic undifferentiated type, and that he should be committed to a mental hospital. At the hearing petitioner's counsel was present. On September 15, 1955, after argument, the District Court granted the United States Attorney's oral motion to dismiss the lunacy petition. Dr. Griffin, however, filed a report in September 1955, repeating that in his view petitioner was suffering from a schizophrenic reaction, chronic undifferentiated type. He also pointed out aspects of petitioner's bizarre behavior, e. g., petitioner would lie under his bed, smear himself with and eat his feces and urine, would imagine himself surrounded by spirits and would constantly speak of trying to kill people.

9. On February 1, 1957, the Superintendent of the Reformatory requested the Division of Legal Psychiatric Services to undertake a new diagnosis of petitioner, based on a report by Dr. Edward Gallagher, Reformatory Medical Officer, to the effect that petitioner had renewed his bizarre activities, including those mentioned in note 6, supra, and, additionally, the wearing of paper shrouds to keep out the spirits and mumbling of religious hallucinations. On February 19, 1957, he was examined by Dr. Griffin

On May 1, 1957, petitioner filed the instant motion to vacate sentence pursuant to 28 U.S.C. § 2255. No grounds for relief were specified and the District Court denied the motion without hearing. A petition for leave to appeal in forma pauperis was also denied. Petitioner renewed his petition in this court, alleging that he "was an escaped mental patient from the Western State Hospital in Virginia," and asserting that his counsel had been ineffective, in that counsel had been drunk at one of the hearings and had prevented petitioner from taking the stand in his own behalf. Because these allegations had not been made to the District Court and, if true, might be grounds for relief pursuant to 28 U.S.C. § 2255, this court remanded the case to the District Court for a hearing on petitioner's allegations. The District Court appointed counsel and conducted a hearing, at which only petitioner, petitioner's trial counsel and the Government's trial counsel testified. The court found that petitioner had been effectively represented throughout the proceedings against him, and that petitioner was entitled to no relief. The court also denied leave to appeal in forma pauperis.

On May 5, 1958, petitioner unsuccessfully renewed his forma pauperis petition before a division of this court. This petition for a rehearing in banc followed.

The foregoing matters raise disturbing questions: Was petitioner properly found competent to stand trial? See Bishop v. United States, 1955, 96 U.S. App.D.C. 117, 223 F.2d 582, reversed on other grounds 1956, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835. Was petitioner deprived of the effective assistance of counsel at crucial stages in these proceedings? See Von Moltke v. Gillies, 1948, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309. What is the effect of the court's refusal at the second competency proceeding to provide, at Government expense, both a transcript of the original competency proceeding and psychiatrists to testify in his behalf? See Williams v. United States, 1957, 102 U.S.App.D.C. 51, 250 F.2d 19. Do the findings of fact made pursuant to the limited hearing conducted upon this court's remand constitute a bar to consideration of some or all of these issues? Should the hearing on the motion to vacate sentence have been confined in scope to consideration of the allegations of the movant, whose mental history suggests a *prima facie* inability to be master of his own pleadings? Is petitioner entitled to reopen his direct appeal? See Lebkicker v. United States, No. 13932 (per curiam order dated March 24, 1958); Belton v. United States, 104 U.S.App. D.C. 81, 259 F.2d 811; Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 244

and Dr. Kushner of Legal Psychiatric Services. The latter's report concluded:

"The patient appears to be an elderly psychopath who can go to great lengths to achieve his ends. It is the opinion of myself and Dr. Griffin that the diagnosis of St. Elizabeths (i. e., sociopathic personality) is accurate; that is that the patient exhibits an antisocial reaction and that he is malingering psychosis in order to obtain gratification from easier treatment by being transferred to a hospital or by being given medication. Dr. Griffin is, by the way, one of the people who examined Mr. Clatterbuck in the summer of 1955, and it is his impression that his diagnosis at that time was mistaken. It is to be noted that this man lived for 54 years on the basis of how he could manipulate people into supplying his various needs. Thus he has become extremely adept at such behavior. Since he has spent a good portion of his life in mental hospitals, his feigning of psychoses at times may be quite convincing.

"It is the opinion of Legal Psychiatric Services that at present this man is not psychotic and that he has not been psychotic for many years despite severely bizarre behavior. It is to be anticipated that he will continue to represent a management problem. This would perhaps best be handled by the closest surveillance and by treating his unusual actions as breaches of discipline."

After receiving this report, the Lorton authorities apparently decided that a transfer to a mental institution was not necessary. It was two months after this report had been sent to Lorton that petitioner filed his motion to vacate sentence.

F.2d 355. If so, by what evidence adduced at trial was petitioner's sanity at the time of the offense proven "beyond a reasonable doubt," as is required once some evidence of insanity has been introduced? See Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499; Tatum v. United States, 1951, 88 U.S.App.D.C.386, 190 F.2d 612; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52.

Information vital to intelligent determination of these and other issues lurking in this case is buried in the stenographic notes of the several hearings described above. *None* of these notes have been transcribed.[10] Absent transcripts we have, apart from the Government's opposition, only petitioner's bare forma pauperis application and the doubt-provoking records in the District Court files as a basis on which to rule. These papers cast little light, but much shadow, on the validity of the proceedings conducted below. Yet this court has disposed of the instant *pro se* petition without appointing counsel to represent petitioner and without ordering transcriptions of the various proceedings.

In the past we have cited ignorance, indigence and incarceration as indications of inability to present a case properly to this court. See Belton v. United States, 104 U.S.App.D.C. 81, 259 F.2d 811, and Blunt v. United States, 100 U.S. App.D.C. 266, 272, 244 F.2d 355, 361. Such inability is immeasurably confirmed by the strong manifestations of incompetency present here.

In the light of all the foregoing, I would grant the petition for a rehearing in banc, appoint competent counsel for petitioner, and provide him with transcripts of all the proceedings in this case from its inception. Until we have had the benefit of his investigations and views, I would withhold action on the petition for leave to appeal in forma pauperis.

WASHINGTON, Circuit Judge.

I vote against a rehearing en banc, as I perceive no issue which is ripe for consideration by the entire court. The questions whether Clatterbuck received the effective assistance of counsel at his trial, and whether additional counsel should be appointed for him, are still being considered by a division of the court, which has ordered—but has not yet received— a transcript of the testimony taken at the hearing held by the District Court on January 31, 1958, under Section 2255 of Title 28 U.S.Code (1952).

Judge Bazelon's recital of the circumstances of Clatterbuck's trial and confinement serves to provide, among other things, additional evidence that the legislation which Congress adopted a decade ago for dealing with mental defectives accused or convicted of crime[1] is not working as well as the framers expected. The portion of that legislation relating to the care of prisoners alleged to be "insane or of unsound mind or otherwise defective," Section 4241 of Title 18, U.S.Code, was intended to be applied broadly and remedially. This court has on an earlier occasion in Clatterbuck's history, as Judge Bazelon points out, called the attention of the authorities to the provisions of that section. It may not be out of order to remind them of it once again. No doubt, too, they should consider whether or not to invoke Section 4247 of the same Title, if examination should re-

---

10. While the present petition for rehearing in banc was under consideration by the court, the panel which originally heard the case ordered up a transcript of the § 2255 hearing below. A transcript of that hearing will not, however, sufficiently assist in conducting the broad inquiry required here, even assuming that the issue of petitioner's mental competency was raised for the § 2255 hearing by petition-er's allegation that "he was an escaped mental patient from the Western State Hospital in Virginia." For, as I have noted above, only petitioner, his trial counsel, and the Government's trial counsel testified at the hearing. Moreover, they testified without benefit of transcript as to proceedings which had occurred some months previous to the hearing.

1. 18 U.S.C.A. §§ 4241–4248.

veal that Clatterbuck is "insane or mentally incompetent, and that if released he will probably endanger the safety of the officers, the property, or other interests of the United States, and that suitable arrangements for the custody and care of the prisoner are not otherwise available." If these findings are made, and confirmed by judicial hearing, Clatterbuck may be detained after the expiration of his sentence, presumably in a mental institution rather than a prison. While the previous attitude of the authorities towards Clatterbuck may perhaps make it embarrassing for them to take action under either of the cited statutes, we cannot assume that embarrassment will cause them to fail to perform their prescribed duties.

But if neither of these statutes is invoked, and Clatterbuck is released at the expiration of his sentence, the community is not without means of self-protection. If Clatterbuck is considered "insane" or "of unsound mind" by qualified persons, proceedings can be brought for civil commitment under Sections 21–310, 21–311, 21–326 of the D.C.Code (1951), supported by proper affidavits. Cf. Overholser v. Williams, 1958, 102 U.S.App.D.C. 248, 252 F.2d 629. If Clatterbuck is not considered to be insane or of unsound mind, but is deemed to be a "sexual psychopath," the United States Attorney may file with the Clerk of the District Court "a statement in writing setting forth the facts tending to show that such a person is a sexual psychopath." D.C.Code, Title 22, § 3504(a) (1951). This would be followed by examination under Section 22–3506, and (if the proof suffices) hearing and commitment under Section 22–3508. The statute defines a "sexual psychopath" as "a person, not insane, who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his sexual impulses as to be dangerous to other persons because he is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his desire." § 22–3503(1).

Whether the Government has the requisite proof to sustain any of these procedures is not appropriate for discussion here. But it does seem appropriate to say that possible inconsistency in its attitudes toward Clatterbuck should not impede the Government in any proper steps it takes for his hospitalization or the protection of the community.

### On Motion for Appointment of Counsel

Before EDGERTON, WASHINGTON and DANAHER, Circuit Judges.

### PER CURIAM.

On June 5, 1958, this division of the court denied Clatterbuck's petition for leave to appeal in forma pauperis from a decision of the District Court, rendered after a hearing held on January 31, 1958, denying him relief under Section 2255 of Title 28 U.S.Code (1952). Clatterbuck then applied for a rehearing en banc. While that request was pending, the division ordered (on October 15, 1958) the transcript of the proceedings at the hearing held on January 31, 1958, to be supplied at Government expense. On October 22, Clatterbuck filed a motion for appointment of counsel. On October 30, 1958, the entire court (two judges dissenting) denied reconsideration en banc of the petition for leave to appeal in forma pauperis. The general background of the case is described in statements filed at that time. See opinion of Oct. 30, 1958, supra.

The transcript of the January 31 hearing was received on November 19, 1958. It discloses that the attorney appointed by the District Court to represent Clatterbuck at the hearing called as witnesses the attorney who had represented Clatterbuck at his trial, the Assistant United States Attorney who had conducted the prosecution, and Clatterbuck himself. The testimony thus elicited led the District Judge to make, *inter alia,* findings of fact to the effect that petitioner's trial counsel was experienced in the trial of criminal cases; that prior to trial he had discussed with petitioner the defense of his case and at trial had raised the defense of insanity on behalf

of petitioner; that he had advised petitioner of his right to testify at the trial in his own behalf but that petitioner had decided not to testify; and that trial counsel had not, as petitioner had alleged, been under the influence of alcohol at the hearing in the District Court on September 1, 1954 or incapable at any stage of the case of representing petitioner effectively. A finding was also made that petitioner had been "effectively represented during all the stages of his case up to and including the imposition of his sentence on November 19, 1954." The court concluded as a matter of law that petitioner was not entitled to relief under Section 2255.

These findings seem to us well supported by the evidence. There is, however, a passage in the testimony of the defense trial counsel, on cross-examination by Government counsel, which has received our special consideration. It is this:

"Q. At that time [the trial] in your opinion did Clatterbuck know that he was in a court of law being tried? A. There was nothing that occurred that would give me the impression that Mc. Clatterbuck did not know that we were in court at that time, and that the trial was in progress.

"Q. Was there anything in his actions or appearance that would indicate to you that he did not understand the proceedings as they developed over the two day period? A. Nothing that I recall. As a matter of fact, I do recall a long conversation with him during the period of time that the jury was out deliberating; that *my impression of that conversation now is that he didn't know that we had been on trial and that we were awaiting the verdict of the jury.*

"Q. During the course of the trial did he ever make any suggestions to you? A. During the course of the trial, Mr. Clatterbuck had toilet paper on which he was making notes, but at no time did he indicate that he wanted me to do anything about the cross examination or the testimony other than what I was trying to do." (Emphasis supplied.)

The emphasized passage, standing alone, furnishes some evidence that Clatterbuck was not mentally competent to stand trial. The same witness also testified, however, with reference to Clatterbuck's conduct at the trial:

"The fact that he was making notes and the fact of the way he would take the toilet paper out and the way he was doing it, gave me the impression that he knew what he was doing and that it was for a designed purpose."

This statement is supported by the diagnosis reached by Dr. Overholser, Superintendent of St. Elizabeths Hospital, at the time he notified the District Court that in his opinion Clatterbuck was at that time (May of 1954) competent to stand trial. In a letter written to the Director of the Bureau of Prisons he said, among other things, "May we call your attention to the fact that, in our opinion, there is a distinct possibility Mr. Clatterbuck may attempt to simulate mental illness if he is sentenced to jail. It is, therefore, suggested that this be kept in mind in the event that such symptoms do, apparently, develop." (Letter of May 17, 1954) Significant, too, is the conclusion reached by Dr. Griffin and Dr. Kushner in February of 1957, that Clatterbuck was at that time "malingering psychosis," and that "he has not been psychotic for many years despite severely bizarre behavior."[1] They added: "It is to be noted that this man lived for 54 years on the basis of how he could manipulate people into supplying his various needs. Thus he has become extremely adept at such behavior. Since he has spent a good portion of his life in mental hospitals, his feigning of psy-

1. See fn. 9 of Judge Bazelon's statement of October 30, 1958.

choses at times may be quite convincing."

The transcript now before us also indicates that a hearing was held before Judge Youngdahl on September 1, 1954, to determine Clatterbuck's competency to stand trial; that two psychiatrists, Dr. Cushard and Dr. Epstein, testified on that occasion that Clatterbuck was competent; and that (as we have noted) the Superintendent of St. Elizabeths had filed a statement to the same effect in May. The transcript of the proceeding before Judge Youngdahl is not presently available, and the reporter is no longer with the District Court. That proceeding resulted in a judicial finding that Clatterbuck was competent to stand trial.[2] He was tried and convicted in November, 1954. The attorney appointed by the District Court to represent Clatterbuck at the Section 2255 hearing appears to have given him conscientious and capable representation. He did not take an appeal from the court's order, but we do not think he failed in his duty to his client by not doing so. Appoint-

ment of counsel at this stage to file a new motion under Section 2255 in the District Court, on the ground of incompetency to stand trial, seems unwarranted. We do not know whether Clatterbuck wishes to proceed on any such ground, now that his sentence is drawing near its close. In fact, we do not know whether he is mentally competent today, or capable of understanding the advantages or disadvantages of such actions.[3] We are cognizant, too, of the formidable difficulties counsel would experience in attempting to show that Judge Youngdahl's order of September 1, 1954, was erroneous, and that on that date or in November of 1954 Clatterbuck was incompetent to stand trial. Counsel would have an almost insuperable task, in the face of the contemporary testimony of Drs. Cushard and Epstein, and the certificate of Dr. Overholser. In all the circumstances, we think appointment of counsel for any purpose would be unjustified.[4] The motion must be

Denied.

2. Judge Letts, in his order of February 5, 1958, made the following finding, among others:

"5. Prior to trial, the Court judicially determined that the defendant was mentally competent to stand trial after a hearing held on September 1, 1954, at which the Court heard the testimony of Drs. Cushard and Epstein who were members of the staff at Saint Elizabeths Hospital where the defendant had been under treatment and who qualified as expert witnesses in the field of psychiatry."

3. The United States Attorney recently advised the court that he has arranged to have Clatterbuck examined by two psychiatrists, "with reference to the provisions of 21 D.C.Code 311 and also with reference to the provisions of the sex psychopath law which is 22 D.C.Code 3504." Subsequently he advised us that on March 20, 1959, the District Court entered an order committing Clatterbuck to the District of Columbia General Hospital for examination by two designated psychiatrists, pursuant to D.C.Code, § 22-

3506 (1951). The order directed each of these latter psychiatrists to file, on or before April 21, 1959, a written report of the examination, "which shall include a statement of his conclusion as to whether the person examined is a sexual psycopath."

4. If a new proceeding under Section 2255 were brought in the District Court, based on alleged incompetency at the time of trial, the Government might well argue that that issue was before Judge Letts at the January 31, 1958, hearing, inasmuch as one of Clatterbuck's contentions was that he was "an escaped mental patient from Western State Hospital, Staunton Virginia"; that the testimony at the hearing showed this to be true; and that the behavior of Clatterbuck at the trial was the subject of testimony. See discussion herein; also the finding quoted in footnote 2, supra. However, we leave the question open. Cf. Plummer v. United States, 1958, 104 U.S.App.D.C. 211, 260 F.2d 729.