746 A.2d 1073 (2000)
329 N.J. Super. 128
STATE of New Jersey, Plaintiff-Respondent,
v.
Domingo VELEZ, Jr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 9, 2000.
Decided March 13, 2000.
*1074 Paul B. Halligan, Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Matthew Astore, Deputy Public Defender II, of counsel; Mr. Halligan, on the brief).
Nancy A. Hulett, Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney; Ms. Hulett, of counsel and on the brief).
Before Judges BAIME, BROCHIN and EICHEN.
The opinion of the court was delivered by BAIME, P.J.A.D.
Following a protracted trial, defendant was acquitted of two counts of aggravated sexual assault (N.J.S.A. 2C:14-2a(1) and (3)), but was convicted of second degree aggravated assault (N.J.S.A. 2C:12-1b(1)), first degree kidnaping (N.J.S.A. 2C:13-1b), and fourth degree endangering the welfare of a child (N.J.S.A. 2C:24-4a). We affirmed defendant's convictions in an unreported opinion, but remanded the matter to the Law Division to correct an illegal sentence. Defendant was ultimately sentenced to sixty years imprisonment with a thirty year parole disqualifier. After our affirmance of the corrected sentence, defendant filed a pro se petition for post-conviction relief. The Law Division denied defendant's petition, and he now appeals. We hold that defendant was denied the effective assistance of counsel in the post-conviction relief proceedings.

I.
We need not recount the facts at length because they are described in detail in our earlier opinion. Suffice it to say, the three year old victim was abducted from her home and beaten and raped. Even to seasoned judges hardened to society's pathology, this case is marked by the outrageous brutality of the sexual attack. The victim was indeed a pitiful figure and was found to be incompetent to testify.
In the early morning hours of February 22, 1992, Terry Robinson was awakened by a barking dog. Upon opening the front door, he observed the battered and bruised victim. When asked whether her "daddy" had done this to her, the child nodded in the affirmative. The victim also indicated that she had been attacked in the woods adjacent to Robinson's house.
The police were summoned and the victim was transported to the hospital. There was no question but that the child had been beaten and raped. Pine cone needles were matted in her hair, her face was bruised and bloodied, a patch of hair *1075 had been ripped from her scalp, her hymen had been penetrated, and there was a deep laceration from the back of her vagina to the front of her anus.
The police were later contacted by the victim's aunt, Mildred M., who indicated that the child had been abducted from her bedroom the night before. Eventually, the child's mother, Diane M., was located and appeared at the hospital. When asked who had beaten her, the victim responded, "Junior." Diane identified "Junior" as defendant, her sister Betty's boyfriend. Defendant had visited Mildred's house several hours before the abduction of the victim. He appeared drunk and left. The child identified defendant's picture from a photographic array. Upon seeing defendant's photograph, the child's demeanor changed "drastically" and she began to cry. In subsequent interviews with a sexual assault specialist, the victim indicated that defendant was not alone when she was attacked. She asserted that "daddy" and other "monsters" were with defendant.
The man who the victim described as "daddy" was never apprehended or identified. The police ruled out the child's biological father who visited her at the hospital and who was warmly greeted by her. The victim's mother had engaged in a four month relationship with a man the child called "daddy," but he had moved out of her residence. Diane indicated that she knew the man as "Freddy" and never learned his last name.
Defendant was arrested and gave a written statement. The defense was one of alibi. Defendant claimed that he was at his girlfriend's house on the date the crimes were committed. At trial, defendant's statement and testimony were corroborated by his girlfriend. However, the prosecution called a surprise witness, Corrections Officer Keith Fauconniere, who testified that while defendant was being "processed" in jail, he confessed "[he] did it." According to Fauconniere, defendant asked, "[s]o what's the big deal," "it's only a little kid." Fauconniere claimed that he did not volunteer this information before trial because he had "always been told not to get involved with any criminal investigations or interviews."
We briefly describe the police investigation. The police found several items at the scene of the crime. Although pine needles similar to those in the wooded area in which the crimes were committed were found in defendant's car, none of the other tangible evidence implicated defendant. Semen found in a condom discovered at the scene was subjected to DNA testing and was determined not to be that of defendant. Semen found in a second condom was tested, but the results were inconclusive. Semen on the victim's pants was conclusively found not to be that of defendant. Semen on the child's sweatshirt and pants was tested, but like the semen in the second condom, the results were inconclusive. A blonde pubic hair found on the child's pants was that of a Caucasian. Defendant is a dark-haired Hispanic.
Much of the trial was devoted to the physical evidence. Defendant's attorney argued vigorously that this evidence excluded defendant as a suspect and bolstered his alibi defense. In response, the prosecutor observed in her summation:
There was semen all over her sweatshirt... [but] the sweatshirt was inconclusive, and inconclusive can mean any male that left semen on that sweatshirt, and including Junior ... then you have cuttings two through six, also on the pants that were inconclusive, that could not rule Domingo Velez out. [These] cuttings ... absolutely could not rule Domingo Velez out. And it's important because those particular semen stains did not have enough sperm, the others did....
One condom was full of semen and had plenty of sperm and was a DNA match that did not match Mr. Velez. But one condom had plenty of semen, but no sperm and was inconclusive. So you *1076 have an inconclusive to the condom, you have an inconclusive for areas on the pants, and you have an inconclusive on the sweatshirt. Does DNA rule [defendant] out or is it just inconclusive? And the State maintains it's just inconclusive.
Although the facts presented at trial had all the earmarks of accomplice liability, the prosecutor never alluded to this subject. Nor did she request a charge allowing the jury to find defendant guilty either as a principal or as an accomplice. The trial court's instructions were also devoid of any mention of accomplice liability.

II.
In his pro se petition for post-conviction relief, defendant asserted: (1) he was denied the effective assistance of trial and appellate counsel, (2) testimony of the sexual assault therapist should have been excluded, and (3) he was entitled to newly developed DNA testing of the semen samples that had yielded inconclusive results respecting their source. Although the Public Defender assigned an attorney to represent defendant, the lawyer did not consult with him except immediately prior to the scheduled hearing, did not read the trial transcript, did not investigate defendant's claims, and did not file an amended petition. Instead, the attorney was content merely to recite defendant's pro se contentions. The Law Division denied the petition on this basis.
We agree with defendant's argument that he was denied the effective assistance of counsel in the post-conviction proceedings. Our rules of practice mandate that a defendant's first petition for post-conviction relief must be referred to the Public Defender for the assignment of counsel. R. 3:22-6. It is axiomatic that counsel, once appointed, becomes bound to fully and faithfully serve the interests of his client within the boundaries of professional ethics. The rules plainly envisage the effective assistance of an attorney in his professional capacity. No one can currently dispute the principle that mere appointment, without more, does not satisfy the requirements of our rules. As we observed in State v. Clark, 260 N.J.Super. 559, 617 A.2d 286 (App.Div.1992), "no true justice system could be satisfied with pro forma fulfillment of a guarantee as important as the right to counsel where there has been no actual assistance rendered." Id. at 562, 617 A.2d 286. At a minimum, assigned counsel must communicate with his client, fashion the most effective arguments possible, amend the petition when warranted, and inspect the trial record. Id. at 563, 617 A.2d 286; see also State v. King, 117 N.J.Super. 109, 111, 283 A.2d 757 (App.Div.1971).
We recognize that convicted defendants are strongly motivated to attack the validity of their convictions. Particularly after a conviction has been affirmed on direct appeal, an attorney representing a defendant in post-conviction relief proceedings may have little ammunition. Neither the Sixth Amendment nor our rules call for an attorney to be "effective" in terms of crafting a defense when none actually exists.
All that we require is that counsel give his best efforts to his client's cause. The importance of this effort stems from the attorney's ethical obligations and the principles of preclusion which bar the defendant from later advancing claims that could have been raised in the post-conviction relief proceeding, but were not. It is of advantage to our legal system to have a first post-conviction relief petition raise all fairly arguable issues at the time the petition is heard. We have expressed disapproval of a piecemeal approach to criminal litigation. Ibid. Our federal counterparts have been similarly disinclined on habeas corpus review to consider issues which were not raised in prior state proceedings. See, e.g., Gray v. Netherland, 518 U.S. 152, 163, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457, 470 (1996); Picard v. Connor, 404 U.S. 270, 278, 92 S.Ct. 509, 513, 30 L.Ed.2d 438, 445 (1971); Morris v. Horn, 187 F.3d 333, 337 (3d Cir.1999); Christy v. Horn, 115 F.3d 201, 206 (3d Cir.1997).
*1077 Against this backdrop, it was not enough for counsel to blandly recite defendant's poorly articulated and inadequately presented arguments. The attorney's passing familiarity with defendant's claims satisfied neither the mandate of our rules nor counsel's professional obligations. While perhaps defendant in this case received more from the system than did the defendant in State v. Clark, 260 N.J.Super. 559, 617 A.2d 286, where the defense attorney did not even appear at the hearing, it was not much more.
The State's defense of the quality of defense counsel's representation can fairly be characterized as lukewarm. The State, instead, argues that whatever deficiencies there were in the attorney's performance, they did not "materially contribute" to the denial of defendant's petition. State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987). As phrased by the State, defendant was not prejudiced by his attorney's professional errors, because there was no reasonable probability of success respecting the arguments advanced in attacking the underlying convictions.
The benchmark for judging ineffective assistance of counsel claims is whether the defense attorney's professional errors "materially contributed" to the defendant's conviction. Ibid. As a general rule, the defendant must prove prejudicethat is, he must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984). A reasonable probability "is a probability sufficient to undermine confidence in the outcome." Ibid.
That standard is difficult to apply in the context of evaluating a claim of ineffective assistance of post-conviction relief counsel. Only by an exhaustive examination of the entire trial record can it be determined whether a viable attack might have been made on the underlying conviction. It is arguable that this should be the job of the appellate attorney who challenges the quality of the defense lawyer's representation of the defendant in the post-conviction relief proceedings. But often the trial record will not fully disclose all of the avenues that could have been pursued by post-conviction relief counsel in attacking the underlying judgment. Cf. State v. Preciose, 129 N.J. 451, 609 A.2d 1280 (1992). Here, for example, nothing was done to locate and question Diane's former live-in boyfriend who might have been considered a suspect in the crimes by virtue of the victim's repeated statements. Nor did post-conviction relief counsel investigate the circumstances surrounding Fauconniere's surprise appearance as a State's witness at trial.
We think a different rule should be applied in a case such as the one before us, where the defendant's post-conviction relief attorney entirely failed to subject the prosecution's case to meaningful adversarial testing. See United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657, 668 (1984). Where, as here, the attorney's representation of the defendant amounts to no representation at all, the post-conviction relief process should begin anew with the appointment of an attorney willing and able to serve as an advocate for his client.

III.
We treat separately defendant's request for DNA testing of the semen samples found inconclusive. In his appellate brief, defendant argues that newly developed DNA techniques can yield definitive findings respecting even minute samples of semen. This argument was advanced in defendant's pro se petition, but the contention was never fully developed. The State dismisses defendant's contention, noting that even a definitive finding excluding defendant as a possible source of the semen found on the victim's sweatshirt, pants, and in the second condom would have no exculpatory effect. The prosecution points to the fact that (1) the condom was discovered in an area known to have *1078 been frequented by persons engaging in sexual activities, and (2) defendant was acquitted of the aggravated sexual assault charges.
We agree that a DNA profile eliminating defendant as a possible source of the semen would not constitute "proof positive" of his innocence. This much conceded, it might tend to negate the inference that defendant was present at the scene of the crimes. It will be recalled that the prosecutor heavily relied upon the inconclusive DNA findings in arguing that the jury could not "rule [defendant] out as a suspect." The inconclusive samples could well have had a "spillover" effect respecting the kidnaping, aggravated assault and endangering charges. The jury might have harbored a reasonable doubt as to whether defendant sexually assaulted the victim, but nonetheless concluded that the evidence pointed to his guilt of the other charges.
Of course, all of this is speculative. We do not know whether newly developed DNA testing techniques might yield definitive findings with respect to the inconclusive semen samples. We do not know whether the samples have been contaminated. We do not know whether DNA testing would ensnare other suspects. We do not know what additional evidence, if any, newly assigned post-conviction relief counsel might uncover.
We are convinced, however, that defendant should be afforded an opportunity to have these questions resolved. If defendant on remand shows that newly developed DNA techniques can yield definitive findings, such tests should be ordered under the supervision of the court. The Law Division should then determine whether any newly discovered evidence would "probably change the jury's verdict if a new trial were granted." State v. Carter, 85 N.J. 300, 314, 426 A.2d 501 (1981). We can anticipate a plethora of legal issues that might arise on a fully developed record. For example, since many of the victim's statements were admitted under the "tender years" hearsay exception, an exception applicable only to sexual offenses, see N.J.R.E. 803(c)(27), it is arguable that this evidence could not be considered in evaluating the likelihood of success on a motion for new trial respecting the non-sexual crimes charged. We do not reach these questions here.
We add that the result we reach is compelled by State v. Thomas, 245 N.J.Super. 428, 586 A.2d 250 (App.Div.1991). This appeal has none of the procedural problems that occasioned the dissenting opinion in that case. Id. at 435, 586 A.2d 250. Nor do the facts here bear resemblance to those in State v. White, 260 N.J.Super. 531, 617 A.2d 272 (App.Div.1992), where we upheld the denial of post-conviction DNA testing. We recognize the importance of finality. However, the objective of the criminal justice system is the fair conviction of the guilty and the protection of the innocent. The system fails if an innocent person is convicted. We offer no view on that subject. We merely note that post-conviction relief remedies were designed to provide one last avenue of review to assure that no mistake was made. Our decision does no more than seek to implement that mandate.
Reversed and remanded for further proceedings consistent with this opinion.