811 A.2d 425

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. DUDLEY RUE, DEFENDANT–RESPONDENT.

Argued September 9, 2002—Decided December 12, 2002.

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

*William B. Smith,* Deputy Public Defender II, argued the cause for respondent (*Peter A. Garcia,* Acting Public Defender, attorney).

The opinion of the Court was delivered by

LONG, J.

This appeal stems from the claim of defendant, Dudley Rue, that the lawyer assigned to represent him on his first post-conviction relief (PCR) petition essentially jettisoned his case by pointing out its deficiencies to the trial court and characterizing it as "without merit." He contends that his attorney's conduct violated *Rule* 3:22–6 which provides in relevant part: (1) on a first PCR petition, counsel should be assigned; (2) counsel may not withdraw on the ground of lack of merit of the petition; and (3) he or she "should advance any grounds insisted upon by defendant notwithstanding that counsel deems them without merit." The State counters that, in underscoring the lack of merit in Rue's petition, his counsel abided by the terms of *RPC* 3.1, which enunciates a general standard of ethical behavior for lawyers and provides:

> A lawyer shall not bring or defend a proceeding, nor assert or controvert an issue therein unless the lawyer knows or reasonably believes that there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

Alternatively, the State urges us to address what it perceives to be a disconnection between *Rule* 3:22–6 and *RPC* 3.1.

We hold that *Rule* 3:22–6, and not *RPC* 3.1, governs the performance of PCR counsel and that if the standard of conduct imposed by that rule is violated, a new PCR proceeding will be required.

I

Defendant, Dudley Rue, was charged in Mercer County Indictment, 92–07–0827–I, along with co-defendants Rory Bryson, Robert Dodson, Robert Williams, and Tyrone Williams, with first-degree murder in violation of *N.J.S.A.* 2C:11–3(a)(1)(2) and *N.J.S.A.* 2C:2–6 (count one); second degree possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4(a) and *N.J.S.A.* 2C:2–6 (count two); third degree unlawful possession of a weapon without a permit in violation of *N.J.S.A.* 2C:39–5(b) (count three); and third degree possession of cocaine in violation of *N.J.S.A.* 2C:35–10(a)(1) and *N.J.S.A.* 2C:2–6 (count four).

Defendant was tried alone. At his trial, the State presented the following evidence. On March 10, 1992, at 3:30 p.m., Robert Dodson, a/k/a "Silk", had an altercation with Jeffrey Glanton, a/k/a "Newark", on East Hanover Street in Trenton. Shinnette Williams, Harriette Stephens and Terrence Darnell Williams witnessed the incident. Believing that Glanton had stolen money and drugs from a girlfriend, Dodson struck Glanton with an aluminum baseball bat. Glanton then grabbed the bat as it slipped out of Dodson's hands and hit Dodson on the leg with it. Dodson limped around the corner, placed a call from a pay phone, and asked Terrence Williams to call "Bones" (Tyrone Williams) to "get over here" because he and Glanton were fighting.

Tyrone Williams soon appeared carrying a blue bag. Harriette Stephens pointed Glanton out to him at which time Williams walked up to Glanton and hit him with his fist. A blue Hyundai drove up and the occupants, four African American men, jumped out at the same time and ambushed Glanton. The men, each armed with a handgun, used the guns to beat Glanton. One of the assailants was later identified as defendant, Dudley Rue, by Shinnette Williams and Harriette Stephens.

According to the witnesses, Glanton was essentially defenseless, and his head was split "wide open." During the beating, one of the hand guns discharged, apparently accidentally. The sound of the gunfire attracted the attention of Trenton Police Officers

Jeremiah Maldonado and Luis Medina, who were on routine patrol. The assailants continued to beat Glanton until they saw the police car, at which point they scattered.

According to Officers Maldonado and Medina, Rue and another of the assailants, Rory Bryson, walked "very quickly" toward the unoccupied blue Hyundai. Both "appeared to be very nervous." The officers testified that they noticed a distinctive patch of discolored skin measuring four inches long and one and three-quarter inches wide beneath Rue's left eye and that Rue was carrying a gun in his left hand, pointed at the ground. Officer Maldonado informed Medina that Rue was armed, and both officers alighted from their car. Maldonado grabbed Bryson before he could enter the Hyundai. Bryson was in possession of an operable, unloaded Smith & Wesson .357 Magnum. Inside the Hyundai was a paper bag containing fifty-five packets of crack cocaine and a key chain holding crack cocaine.

According to Officer Medina, Rue opened the passenger side door of the car, tossed a gun inside (an operable, unloaded .38 caliber Smith & Wesson Special), and fled with Officer Medina in pursuit. Medina chased Rue through an alley and into a building where Rue was arrested on the third floor. Rue was taken to police headquarters where he gave police the false name of "James Murphy."

Glanton died after surgery at Saint Francis Medical Center. The autopsy disclosed that the cause of death was extensive fractures of the skull as well as brain lacerations due to blunt trauma to the head.

The next day, Shinnette Williams was shown a photographic array at the Trenton Police Department and identified Rue and Bryson as two of the men who beat Glanton to death. Two days later, Harriette Stephens was shown the same array and also identified photographs of Rue and Bryson.

Rue testified on his own behalf to a distinctly different version of the events. He admitted that on March 10, 1992, he, Tyrone

Williams and Rory Bryson heard that their friend Dodson was in a fight and that they decided to investigate the matter and "scare the guy [with whom Dodson was fighting] up." When Tyrone Williams left his house, he brought a blue bag to the Hyundai that Bryson was driving. Just before stopping at East State Street to pick up Dodson, Tyrone Williams opened up the bag and "started issuing out weapons." He passed a .45 caliber gun to Rue with instructions to pass it to Dodson, which Rue claimed he did.

According to Rue, when he saw Glanton standing on the street corner, he recognized him as someone he had known since childhood and a person whom he regarded as his "uncle." He then told the others he was "related" to Glanton and not to "mess with him." (The connection between Rue and Glanton was that Rue's father had children by Glanton's ex-girlfriend's sister.) Rue claimed that his companions ignored his plea and exited the car while he remained in the back seat.

According to Rue, the initial altercation was between Tyrone Williams and Glanton. The others soon joined the fight, striking Glanton on the head and shoulders with the guns. Dodson's gun discharged. When the police arrived, Bryson and Tyrone Williams ran back to the Hyundai, threw their guns inside, and told Rue to run. Rue contended that he exited the car and ran to East State Street and was arrested outside of Dodson's apartment. He also testified that even before he recognized Glanton, his only intention was to "scare the guy up." Prior to the actual attack on Glanton, Rue stated he was unaware of anyone else's intention to kill or injure Glanton. In sum, his testimony was that he originally joined in the plan to "scare" Glanton until he realized who Glanton was, at which point he not only declined to participate and refused to exit the automobile, but vainly attempted to convince his co-defendants to abandon their scheme. He was the only witness to advance that version of the facts.

Given the absence of even a shred of support for his story, it is not surprising that Rue was convicted of murder (count one), possession of a weapon for an unlawful purpose (count two), and

possession of a weapon without a permit (count three). He was acquitted of possession of cocaine (count four). After mergers, he was sentenced to an aggregate custodial term of thirty years without parole.[1]

Rue appealed. His conviction was affirmed by the Appellate Division. *State v. Rue*, 296 *N.J.Super.* 108, 116, 686 *A.*2d 348 (App.Div.1996). We denied certification. *State v. Rue*, 148 *N.J.* 463, 690 *A.*2d 611 (1997). In 1998, Rue filed a *pro se* PCR petition. In his supporting brief, he requested an evidentiary hearing on the issue of ineffective assistance of trial counsel. Specifically, he claimed that his trial counsel failed to investigate and call to the stand his co-defendants along with Gloria Davis, a bystander who witnessed the attack on Glanton. According to Rue, those witnesses would have supported his version of the events.

Counsel was assigned pursuant to *Rule* 3:22–6(a)(2) and filed a supplemental brief and appendix. Point I of the brief advanced no argument at all on behalf of Rue but asked for "clarification of the law in the situation in which PCR counsel believes the client's claims are legally meritless, but the client refuses to withdraw the PCR." In Point II of the brief, counsel outlined the steps that he had taken between June 6, 1999 and December 14, 1999 investigating Rue's claim of ineffective assistance of trial counsel. He had met with Rue twice, interviewed trial counsel twice, and reviewed all of the briefs, trial transcripts and the trial file. He also

---

[1] Bryson was convicted of being an accomplice to first-degree purposeful or knowing murder and for unlawful possession of a handgun without a permit. He was sentenced to a life term with thirty years of parole ineligibility on the murder charge and to a concurrent five-year custodial term on the weapons offense. Dodson pled guilty to aggravated manslaughter and was sentenced to an aggregate custodial term of thirty years with fifteen years of parole eligibility. Robert Williams pled guilty to aggravated manslaughter and was sentenced to an aggregate custodial term of twenty-five years with a twelve and one-half year period of parole ineligibility. Tyrone Williams was not apprehended by the time of defendant's trial and the record does not reveal the disposition of his case.

attended several status conferences with the court and commissioned an investigator to interview most of the proposed witnesses.

Counsel then addressed the merits of Rue's claim serially. First, based on the trial evidence, he rejected outright the availability of a renunciation defense under *N.J.S.A.* 2C:2–6(e) 3 and 5.1, concluding that Rue "did not do enough to completely and voluntarily renounce his participation." Counsel then looked to the omitted witnesses to assess whether their testimony would alter his conclusion regarding renunciation or support Rue's claim that he was merely present at the scene.

With respect to Dodson, Rue's counsel wrote:

There are three problems with co-defendant Robert Dodson. First, on February 23, 1993, Robert Dodson swore out an affidavit stating, ". . . James Murphy [Dudley Rue] at know [sic] time participated in the fight involving Jeffrey Glanton who subsequently died. . . ." A second and nearly identical affidavit was also sworn to by Mr. Dodson also on February 23, 1993.[2] There is a Fed Ex from trial counsel to have the Virginia Public Defender's office interview Mr. Dodson while he was incarcerated there. That Fed Ex contained a copy of Mr. Dodson's statement to the police. At the bottom of page five of the statement, Dodson states, "they walked up to the dude and Tyrone [Williams] had already started fighting with him so they just jumped in and started whacking the guy with pistols. They were hitting him in the head and all over." At the bottom of page 8 of his statement, Mr. Dodson positively identified Dudley Rue from a photograph as being "X." Although the statement is unsworn, Mr. Dodson could be subject to indictment and criminal prosecution for unsworn falsification to authorities if the statement fit the definition under 2C:28–3 and 28–4. On the other hand, if the sworn statements are false there could be perjury prosecution under 2C:28–1 and 28–2. Mr. Dodson's statement closest in time to the incident would probably carry the most weight and would incriminate Mr. Rue. On consultation with trial counsel, the undersigned found that the result of the investigation from Virginia confirmed that Mr. Dodson was not going to be a helpful witness.

The second problem is that Mr. Dodson reported to the undersigned's investigator that he has a pending appeal, that is currently represented by Kevin Main, and that he does not want to affect his appeal. On December 29, 1999, the undersigned called Mr. Main and was informed that Mr. Main completed that appeal years ago and no longer represented Mr. Dodson.

Finally, after Mr. Dodson refused to speak with the undersigned's investigator, the undersigned received a letter from Mr. Dodson saying he sent an exculpatory

---

[2] In that affidavit, Dodson swore that Rue did *not* participate in Glanton's murder.

letter to the Court without giving the undersigned a copy of that letter. To say that there is a degree of skepticism about the credibility of Mr. Dodson is an understatement. Trial counsel's failure to call Mr. Dodson as a witness at trial appears to have been good strategy.

[ (Citations omitted).]

## Counsel went on to assess the other witnesses:

Tyrone Williams was another co-defendant not called by trial counsel. According to Mr. Williams, Dudley Rue was involved, indirectly perhaps, but involved. Mr. Bryson was also not called by Mr. Seelig. Mr. Bryson indicated that he was not going to help Mr. Rue unless he, Mr. Bryson, was going to get some help in return. Similar to Mr. Dodson, it is difficult to predict what testimony would have come from Mr. Bryson and there is a significant credibility problem. Finally, Mr. Robert Williams did not want to cooperate with the latest investigation. Being the brother of a witness that just showed Mr. Rue to be indirectly involved he also does not appear to be the kind of witness trial counsel should have called at trial.

[ (Citations omitted).]

## He then summed up his arguments:

Assuming Mr. Rue could present additional witnesses to show that he stayed in the car, the relevant testimony would have been his and co-defendants as to Mr. Rue's involvement or non-involvement. Other bystanders would have been irrelevant. What happened in the car before they got out would determine whether Mr. Rue was directly or indirectly involved, renounced his participation, or was merely present. Given the investigation, perspective testimony, and credibility of the co-defendants, Mr. Seelig made a good strategic decision not to call them at trial. Remember, at trial the defense should have a strategy, a theory of the case, and not just present every scrap of possible evidence. *Furthermore, on review of the entire set of transcripts, the entire trial file, and the additional investigation conducting [sic] within the PCR the undersigned finds no meritorious issues to argue for Mr. Rue as the law now stands.*

[ (Emphasis added).]

The PCR hearing was similarly devoid of any adversarial tenor. Rue's counsel began his argument with this statement:

As I put in my brief, I don't think Mr. Rue has a meritorious claim on his PCR. I think though it's still incumbent upon me to claim what his argument is.

He then reiterated the reasons why he assessed Rue's contentions as meritless, and concluded:

Judge, I don't want to leave the record—certainly I would like to get Mr. Rue what he wants, a new trial—

I would certainly like to get Mr. Rue what he wants. I would like to get him his new trial if I could. And giving him a new trial would probably bring some delight to him—

. . .

—it's not that I'm against him. I just don't see the legal grounds for it. I just wanted to make the record clear on that. Thank you.

Rue was then given an opportunity to speak on his own behalf. He stated that although he recognized that some of his proposed witnesses gave inconsistent statements, it should have been left to the jury to pass judgment on the credibility of those witnesses.

The prosecutor said very little, relying almost entirely on PCR counsel's arguments:

Your Honor, I would only briefly like to state that the State agrees with [PCR counsel] that Mr. Seelig made a sound and reasoned decision.

The trial court denied relief. His written opinion was rife with references to PCR counsel's conclusions regarding the lack of merit of Rue's contentions:

The defendant asserts that his trial attorney rendered ineffective assistance of counsel. Specifically, defendant argues that his trial attorney was ineffective for failing to obtain co-defendant Robert Dodson's testimony at defendant's trial. Defendant maintains that the purpose of this testimony was to show that defendant did not participate in the attack upon the victim. This argument, however, is without merit.

Whether or not to interview witnesses or call witnesses to testify is a strategic decision left to the trial attorney's discretion. *Defendant's post-conviction relief counsel cites several problems with the co-defendant's testimony. Firstly, defense counsel states* in his brief that the co-defendant gave conflicting accounts as to defendant's involvement in the attack on the victim. [Co-defendant, Dodson signed an affidavit on February 23, 1993 absolving Rue of participation in the murder in contravention of an earlier affidavit of March 21, 1991 in which he swore that Rue was a participant.] These conflicting accounts call into question the co-defendant's credibility in proffering truthful statements. *Therefore, PCR counsel states that after speaking with trial counsel, he concurs with trial counsel's decision that Dodson would not have been a helpful witness.*

Secondly, *defense counsel calls into question Dodson's credibility and truthfulness as a witness. Defense counsel states* that Dodson informed defense counsel's investigator that he has a pending appeal and is being represented by Kevin Mann. However, *defense counsel discovered* that Mr. Main completed Dodson's appeal years ago and no longer represents Dodson. Further, *defense counsel informs* that after Dodson refused to speak with defense counsel's investigator, Dodson advised defense counsel that he sent an exculpatory letter to the Court without providing defense counsel with a copy. *In his brief, defense counsel states, "To say that there is a degree of skepticism about the credibility of Mr. Dodson is an understatement. Trial counsel's failure to call Mr. Dodson as a witness appears to have been good strategy."* The trial attorney's decision not to call Dodson as a witness appears to be objectively reasonable. As a result, the first prong of the

*Strickland* test has not been met. Therefore, this Court concludes that this claim is without merit.

Defendant also asserts that his trial attorney was ineffective for failing to call two other co-defendants, Tyrone Williams and Rory Bryson. However, Mr. Williams stated to PCR counsel's investigator that "Dudley was indirectly involved because everyone was accountable for being in the car at the time." Further, Mr. Bryson indicated to trial counsel that he was not going to help defendant unless he was going to get some help in return. Again, whether to call a witness to testify is a strategic decision left up to the trial attorney's discretion. Defendant provides no reason to believe that trial counsel did not make the strategic not to call Williams and Bryson because that would have been in his client's best interests. The trial attorney's strategic decision appears, based on the information provided, to be objectively reasonable. As a result, the first prong of the *Strickland* test has not been met. Therefore, this Court concludes that this claim is without merit.

Defendant also asserts that trial counsel was ineffective for failing to secure Ms. Gloria Davis as a witness. Defendant maintains that Ms. Davis was a bystander who witnessed the attack upon the victim and could testify that defendant never left the vehicle during the attack. *However, as Post Conviction Relief counsel correctly observes, what occurred in the vehicle before the occupants exited would* determine whether defendant was directly or indirectly involved in the attack, renounced his participation, or was merely present at the scene. Therefore, failure to secure Ms. Davis' testimony did not result in the ineffective assistance of counsel.

[ (Emphasis added).]

Rue appealed. In an unpublished opinion, the Appellate Division reversed and remanded the matter for a new PCR hearing. The panel concluded that although Rue's PCR counsel did not do "nothing" to assist him, he did not faithfully fulfill his obligations under *Rule* 3:22–6(d). To the panel,

[r]egardless of what might be the present state of federal pronouncements upon criminal appellate assigned counsel's obligations where counsel might not consider his or her client's claims as meritorious, our Court Rules clearly direct PCR counsel to advance all grounds insisted upon by defendant regardless of counsel's personal views of the meritoriousness of the claims. *R.* 3:22–6(d).

[ (Citations omitted).]

According to the Appellate Division, PCR counsel did not "advance" Rue's claims but rather advanced the reasons for rejecting them. "Had the issue been presented without counsel's personal views, it may be that, at the least, an evidentiary hearing would have been held." The court noted that, on remand, new PCR counsel should file an application forwarding the claims raised as

required by *Rule* 3:22–6(d) and that the matter should be considered as a first PCR application.

The State filed a petition for certification that we granted. *State v. Rue,* 171 *N.J.* 44, 791 *A.*2d 222 (2002). We now affirm.

## II

Post-conviction relief is New Jersey's analogue to the federal writ of *habeas corpus* and is a safeguard to ensure that a defendant is not unfairly convicted. *State v. Afanador,* 151 *N.J.* 41, 49, 697 *A.*2d 529 (1997). Ordinarily, PCR allows a defendant to challenge the legality of a sentence or final judgment of conviction by presenting arguments that could not have been raised on direct appeal. *Ibid.* As stated in *State v. Preciose,* 129 *N.J.* 451, 609 *A.*2d 1280 (1992), this Court has a "compelling judicial interest in sustaining only those convictions free from constitutional error." *Id.* at 454, 609 *A.*2d 1280; *see also State v. Mayron,* 344 *N.J.Super.* 382, 386, 782 *A.*2d 437 (App.Div.2001) (remarking that post-conviction relief is crucial component of criminal process provided to defendants).

In keeping with our view of the overarching importance of providing defendants a final opportunity to raise constitutional errors that could not have been raised on direct appeal, our court rules, in an initiative unique among our sister-jurisdictions, state that every defendant is entitled to be represented by counsel on a first PCR petition; that if a defendant is indigent, counsel will be assigned; that assigned counsel may not withdraw based on the ground of "lack of merit" of the petition; and that "counsel should advance any grounds insisted on by defendant notwithstanding that counsel deems them without merit." *R.* 3:22–6. Although Rue's PCR counsel advanced Rue's claims, he systematically dismantled each contention in the process. Plainly, that conduct meets neither the letter nor the spirit underlying *Rule* 3:22–6.

The State urges us to refocus our lens on *RPC* 3.1 which it views as antipodal to the aforementioned rule. As we have noted, *RPC* 3.1 generally prohibits lawyers from advancing frivolous

claims. That enactment, according to the State, created a dilemma for Rue's PCR counsel that he reasonably addressed by advancing Rue's arguments yet negatively assessing their merit.

How *RPC* 3.1 relates to *Rule* 3:22–6 is the question. Article 6 of the New Jersey Constitution places both the regulation of the courts and attorney discipline firmly under this Court's purview. *N.J. Const.* Art. 6, § 2, par. 3 ("The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure of all courts. The Supreme Court shall have jurisdiction over ... the discipline of persons admitted [to practice law]."); *see also State v. Clark*, 162 *N.J.* 201, 205, 744 *A.*2d 109 (2000) (authority to adopt practice and procedure rules rests exclusively with Supreme Court); *Straubinger v. Schmitt*, 348 *N.J.Super.* 494, 502, 792 *A.*2d 481 (App.Div.2002) (stating that Supreme Court has sole authority over attorney discipline). Pursuant to our responsibility for the administration of justice, this Court in 1948 promulgated the Court Rules to codify the practice and procedure that it had approved for use in the courts of our state. *N.J. Court Rules* iii (1948) (foreward). In 1984, the Court adopted the Rules of Professional Conduct in an effort to harmonize New Jersey's standards with the Model Rules and to provide clear, enforceable standards of behavior for lawyers. Report of the New Jersey Committee on the Model Rules of Professional Conduct, 112 *N.J.L.J.* 1 (July 28, 1983) (pullout supplement); Kevin H. Michels, *New Jersey Attorney Ethics—The Law of New Jersey Lawyering* 3 (2002). As a practical matter, the Court Rules are the equivalent of the New Jersey Rules of Professional Conduct in terms of the weight of their authority. In other words, neither is entitled to primacy as a matter of law or practice, and they may from time to time require harmonization.

The State argues that the way to harmonize *Rule* 3:22–6(d) and *RPC* 3.1 is to follow the reasoning of the Appellate Division in *State v. Clark*, 260 *N.J.Super.* 559, 617 *A.*2d 286 (App.Div.1992). In *Clark*, in explaining the procedure an assigned PCR counsel

must follow in representing his or her client, the panel stated that "[a]t the very least, consultation and close inspection of the trial record are necessary before counsel may make a determination ... that the petition is wholly without merit." *Id.* at 563, 617 *A.*2d 286. However, the court further stated say that "[i]n the unlikely event that the petition is so deficient on the merits that no argument can be developed for it within the bounds of what an adversarial system permits, counsel for defendant must be prepared to so indicate on the record." *Ibid.*

■ According to the State, *Clark* gives PCR counsel the option to bring the meritlessness of the client's petition to the attention of the PCR court instead of advancing the claim on the client's behalf. To the extent that *Clark* stands for that proposition, we disapprove of *Clark* because it does not comport with *Rule* 3:22–6(d).

In reaching that conclusion, the history of our PCR rule is instructive. Its predecessor, *Rule* 3:10A–6(d) was enacted in 1963 the wake of numerous federal and state initiatives to standardize post-conviction relief procedures. *See, e.g.,* 28 *U.S.C.A.* § 2255 (1948); 38 *Ill. Comp. Stat.* § 826 (1949); *N.C. Gen.Stat. Secs.* § 15–217–22 (1951); *Md. Ann.Code Art.* 27, §§ 645A–45J (1958); *see also* Note, The Uniform Post–Conviction Procedures Act, 69 *Harv. L.Rev.* 1289 (1956). In 1958, the Supreme Court appointed a Committee on the Post–Conviction Rights of Indigents, chaired by Judge Milton Conford to study the issue. Report of New Jersey Supreme Court Committee on Post–Conviction Rights of Indigents, 85 *N.J.L.J.* 557 (1962) ("Comm.Rep."). The Committee rejected the approach taken by federal courts that required a determination of some merit in the petition prior to the assignment of counsel. *See United States v. Keller,* 284 *F.*2d 800, 801 (3d Cir.1960); *Clatterbuck v. United States,* 266 *F.*2d 893 (D.C.Cir. 1958); *Vinson v. United States,* 235 *F.*2d 120 (6th Cir.1956); *Richardson v. United States,* 199 *F.*2d 333 (10th Cir.1952); Bennett Boskey, The Right to Counsel in Appellate Proceedings, 45 *Minn. L.Rev.* 783, 799–800 (observing that in practice federal

courts "look for the existence of at least some glimmer of a substantial question, or for a question which might possibly warrant a hearing, before appointing counsel to represent indigents in collateral attack proceedings."). Instead, the Committee recommended a provision in the Uniform Post–Conviction Procedures Act that would require the assignment of counsel without a preliminary showing of merit. Comm. Rep., *supra*, 85 *N.J.L.J.* at 577 (citing UPCPA § 5 (1956)); Note, *supra*, 69 *Harv. L.Rev.* at 1296 (noting UPCPA's liberal approach to provision of aid to indigent defendants). In so doing, the Committee observed that the role of counsel on PCR is a critical one:

> Experience teaches that the opposing resources of the State and the critical attitude of some trial judges toward the generality of post-conviction applicants combine to defeat relief to an occasional meritorious applicant (meritorious because he has a genuine procedural grievance of a prejudicial nature whether or not he may ultimately again be found guilty of the crime for which he was convicted). *Assignment of counsel will generally result in a skilled evaluation of the applicant's case from an appropriately partisan viewpoint and an assertion by amendment of the petition of all of the possible bases for attack upon the conviction or sentence.* The court and opposition, moreover, are assisted by provision of an adequate record, and having a responsible and competent representative of the applicant to deal with in the progression of the litigation.
>
> [<em>Ibid.</em> (emphasis added).]

The Committee then addressed the situation in which counsel seeks to withdraw for lack of merit. At that time, several jurisdictions explicitly permitted appointed counsel to withdraw from PCR proceedings upon submitting a brief to the court stating the reasons counsel believed defendant's claim to be meritless. The Oregon Act was referred to the Committee by way of example:

> If appointed counsel believes that the original petition cannot be construed to state a ground for relief under this Act, and cannot be amended to state such a ground, he shall, in lieu of moving to amend the petition, inform the petitioner and notify the circuit court of his belief by filing an affidavit stating his belief and his reasons therefore. . . .
>
> [1959 Or. Laws 636.]

Although the Committee recommended that the Court adopt a "tolerant" stance toward attorney withdrawals from frivolous cases, it pointedly declined to recommend the adoption of a rule

like Oregon's allowing such withdrawal for fear that an "[e]xpress provision ... would ... encourage resort thereto by some assigned counsel in unwarranted situations, thereby losing the important benefits flowing from the presence of counsel...." Comm. Rep., *supra*, 85 *N.J.L.J.* at 579. Instead, the Committee recommended that the Rules remain silent on the subject. *Ibid.* After consultation with the Supreme Court on November 16, 1962, however, the Committee abandoned its former recommendation altogether, instead proposing:

> Assigned counsel may not withdraw or apply to the court for leave to withdraw on the ground of lack of merit of the petition. If assigned counsel is not able in good conscience to argue a particular ground for relief desired by defendant to be asserted *he shall submit same to the court nevertheless and identify it as advanced by the defendant personally;* defendant will be at liberty to supplement any brief or written argument submitted by assigned counsel if dissatisfied therewith.
>
> [Tentative Draft of Proposed Rule Relating to Post–Conviction Relief, 86 *N.J.L.J.* 641 (1963) (emphasis added).]

When this Court finally adopted the post-conviction relief rule, it accepted the recommendation of automatic assignment of counsel on a first PCR petition without a preliminary merits screen, but refused to adopt the Committee's compromise proposal that PCR counsel could advance meritless claims by signaling to the court that they were defendant's alone. The final rule stated:

> Assigned counsel may not seek to withdraw on the ground of lack of merit of the petition. Counsel should not be reluctant to advance any grounds insisted upon by defendant notwithstanding he deems them without merit.
>
> [*R.* 3:10A–6(d) (1964).]

In 1967, the Court revised the Rule to incorporate the Public Defender Act, (*N.J.S.A.* 2A:158A–1 *et seq.*) and even more clearly emphasized counsel's absolute *duty to advance all claims.* Whereas the former rule stated that counsel "should not be reluctant" to advance meritless arguments, the revised rule mandated that counsel *"should* advance any grounds insisted upon by defendant notwithstanding he deems them without merit." *R.* 3–10A–6(d) (1968) (emphasis added). The Rule was renumbered as *Rule* 3:22–6(d) in 1969. *R.* 3:22–6 (1969).

*RPC* 3.1, which generally bars lawyers from advancing frivolous claims, was adopted in 1984. Report of New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 *N.J.L.J.* 12 (July 28, 1983) (pullout supplement). The new rule abandoned the subjective approach of former DR 7–102(A), turning the focus from behavior "tending merely to harass or maliciously injure another to a focus relating to the frivolous or non-frivolous nature" of the attorney's behavior. *Ibid.*

Thereafter, in 1994, the Court revisited *Rule* 3:22–6 in order to make it gender neutral. Report of New Jersey Supreme Court Committee on Criminal Practice, 138 *N.J.L.J.* 321 (1994); *see also* Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 3:22–6 (2002). In other words, when we modified *Rule* 3:22–6 in 1994, we were cognizant of the existence of *RPC* 3.1, yet chose to maintain the stricture in the PCR rule requiring the advocation of a defendant's claims, regardless of merit.

Put another way, for nearly forty years, and directly in the face of *RPC* 3.1, our Rules have taken a unique position regarding PCR representation. That choice was obviously motivated by our view of the critical nature of faithful and robust representation of a defendant at a PCR proceeding. PCR is a defendant's last chance to raise constitutional error that may have affected the reliability of his or her criminal conviction. It is not a *pro forma* ritual. That is why we require provision of counsel. Under our scheme that attorney is responsible to communicate with his client and investigate the claims. *State v. Velez,* 329 *N.J.Super.* 128, 133, 746 *A.*2d 1073 (App.Div.2000); *State v. Casimono,* 298 *N.J.Super.* 22, 27, 688 *A.*2d 1093 (App.Div.1997) (remanding case to trial court to determine whether PCR counsel fulfilled his obligations to interview trial counsel, meet with defendant, submit brief, and argue on behalf of defendant); *State v. King,* 117 *N.J.Super.* 109, 111, 283 *A.*2d 757 (App.Div.1971). Based on that communication and investigation, counsel then must "fashion the most effective arguments possible." *Velez, supra,* 329 *N.J.Super.* at 133, 746 *A.*2d 1073.

In some cases, the record will give PCR counsel a wealth of grist for his or her mill, in some cases, not. At the very least, where communication and investigation have yielded little or nothing, counsel must advance the claims the client desires to forward in a petition and brief and make the best available arguments in support of them. Thereafter, as in any case in which a brief is filed, counsel may choose to stand on it at the hearing, and is not required to further engage in expository argument. In no event however, is counsel empowered to denigrate or dismiss the client's claims, to negatively evaluate them, or to render aid and support to the state's opposition. That kind of conduct contravenes our PCR rule.

It goes without saying that a trial court should never put PCR counsel in the position of having to assess the merits of his client's petition. In the first place, that is the trial court's job. In the second, it may precipitate a violation of the letter and spirit of *Rule* 3:22–6.

Because Rue's counsel abandoned any notion of partisan representation by countering every one of his claims and characterizing the entire petition as meritless, Rue did not receive the representation guaranteed by our PCR Rule. Without such counsel, Rue's PCR contentions remain, to this day, wholly unexplored, thus obviating resort to the State's suggestion that we independently evaluate the record. We thus affirm the remand of the case for the assignment of counsel as if on a first PCR petition, and for a new PCR hearing at which all of Rue's claims regarding the absent witnesses and any other claims he seeks to raise should be explored and the most effective arguments in favor of them advanced. The case should be assigned to a different trial court.

### III

The judgment of the Appellate Division is affirmed.

VERNIERO, J., concurring.

I agree with the Court's disposition based on the current text of *Rule* 3:22–6(d). Despite what might have been honorable inten-

tions and a thorough investigation of defendant's claims, PCR counsel breached the rule's clear mandate. As a result, defendant is entitled to the relief sought.

I write separately to address what remains at the center of this case: the Hobson's choice faced by a defense lawyer who honestly views a client's PCR petition to be so lacking in merit that it constitutes the functional equivalent of a fraud on the court. *Compare R.* 3:22–6(d) (requiring PCR counsel to advance arguments, "notwithstanding that counsel deems them without merit") *with RPC* 3.1 (directing that counsel "shall not bring or defend a proceeding, nor assert or controvert an issue therein unless the lawyer knows or reasonably believes that there is a basis for doing so that is not frivolous"). The Court should consider adopting procedures similar to those found at the federal level to enable defense counsel to discharge their obligations to their clients within the broader boundaries of our professional ethics rules.

In *Anders v. California,* the United States Supreme Court designed a procedure that it deemed constitutionally permissible for preserving a defendant's interests and upholding an attorney's professional responsibilities:

> [Counsel's] role as advocate requires that he support his client's appeal to the best of his ability. Of course, if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal.
>
> [386 *U.S.* 738, 744, 87 *S.Ct.* 1396, 1400, 18 *L.Ed.*2d 493, 498 (1967).]

The federal circuits accept *Anders* briefs. *See 1st Cir. R.* 46.6(a)(4); *3d Cir. R.* 109.2(a); *6th Cir. R.* 101(f)(3); *7th Cir. R.* 51(b); *8th Cir. Internal Operating Procedure* II(C)(1); *9th Cir. R.* 4–1(c)(6); *10th Cir. R.* 46.4(B); and *11th Cir. R.* 27–1(a)(8); *see*

also *United States v. Clark,* 284 *F.*3d 563, 564 (5th Cir.2002) (recounting 1994 implementation of *Anders* procedure); *United States v. Ubaldo Hernandez,* 271 *F.*3d 78, 79 (2d Cir.2001) (granting defense counsel's motion, filed via *Anders* brief, to withdraw), *cert. denied,* 534 *U.S.* 1166, 122 *S.Ct.* 1183, 152 *L.Ed.*2d 124 (2002); *United States v. Wilkerson,* 84 *F.*3d 692, 697 (4th Cir.1996) (implementing *Anders* procedure), *cert. denied,* 522 *U.S.* 934, 118 *S.Ct.* 341, 139 *L.Ed.*2d 264 (1997).

A PCR petition "is the state analogue to the federal writ of habeas corpus." *State v. McQuaid,* 147 *N.J.* 464, 482, 688 *A.*2d 584 (1997). Along those lines, federal courts have accepted *Anders* briefs from counsel in civil and criminal habeas proceedings that are akin to petitions for post-conviction relief. *See, e.g., Beck v. Gramley,* No. 95C 632, 1999 *WL* 641648, at *1 (7th Cir. Aug.20, 1999) (requiring and accepting *Anders* brief in criminal habeas proceeding); *Dinkins v. State of Alabama,* 526 *F.*2d 1268, 1269 (5th Cir.) (observing that "[a]lthough counsel serves in this civil habeas corpus proceeding by a discretionary appointment of this court . . ., it is appropriate to apply the principles enunciated in *Anders* to determine whether counsel should be allowed to withdraw"), *cert. denied,* 429 *U.S.* 842, 97 *S.Ct.* 119, 50 *L.Ed.*2d 112 (1976); *United States ex rel. Banks v. Henderson,* 514 *F.*2d 1000 (2d Cir.1975) (granting counsel's *Anders* petition to withdraw from defendant's planned appeal from denial of habeas review).

Many but not all states have adopted the *Anders* procedures for state proceedings. *Compare People v. Stokes,* 95 *N.Y.*2d 633, 722 *N.Y.S.*2d 217, 744 *N.E.*2d 1153, 1155 (2001)(observing that "the procedures adopted by New York courts closely parallel and are clearly modeled upon the procedure set forth by the Supreme Court in *Anders* ") *with In re Attorney's Fees of Mohr,* 97 *Hawai'i* 1, 32 *P.*3d 647, 653 (2001) (noting that "[i]t has been and continues to be the policy of this court not to permit *Anders* briefs"). According to one recent decision, "[i]t is clear that the great majority of courts employ a procedure similar to that described in *Anders*". *State v. Korth,* 650 *N.W.*2d 528, 533 (S.D.2002).

Statistics collected by one legal commentator show that *Anders* briefs comprise up to a third of the criminal case loads of the states that allow them. Martha C. Warner, *Anders in the Fifty States: Some Appellants' Equal Protection is More Equal than Others*, 23 *Fla. St. U.L.Rev.* 625, 643 (1996). However,

> survey responses do not indicate that following the dictates of *Anders* is generally more time-consuming than the average criminal appeal. Forty-nine percent of the courts reported that *Anders* review takes less time than the average criminal appeal, while forty-four percent indicated that *Anders* cases take about the same time to review as the average criminal case. Only seven percent indicated that their *Anders* review takes more time than the average appeal.
>
> [*Id.* at 656.]

Reasonable minds may differ concerning the appropriateness of an *Anders*-like process for either direct appeals or for PCR petitions. Mindful of those differences I do not propose that we adopt such procedures now. Rather, this case affords the Criminal Practice Committee or some other committee of the Court the opportunity to consider the subject. *Anders* ultimately derives from the system's need for candid, independent, and professional counsel. It seeks to balance those needs alongside a defendant's significant interests in this setting. A respectful relationship between the bench and bar warrants at least that we study this issue as part of the Court's regular rules cycle.

In sum, this appeal implicates aspects of *Rule* 3:22–6(d) that, as noted in its opinion, the Court last considered in 1967. Given the passage of time, I would direct an appropriate committee to review the rule for possible modification or revision. If not a rule that mirrors *Anders*, perhaps some variation of *Anders* might be deemed appropriate. If, on the other hand, the committee returns with a recommendation that the Court retain the rule in its present form, then at least we would be provided with an updated administrative record on which to base a final decision.

*For affirmance*—Chief Justice PORITZ, and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and PRESSLER—7.

*Opposed*—None.