SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**In the Matter of Opinion No. 17-2012 of the Advisory Committee on Professional Ethics** (A-22-13) (072810)

**Argued April 1, 2014 -- Decided July 2, 2014**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether a volunteer pro bono attorney may represent a low-income debtor in a no-asset Chapter 7 bankruptcy matter even if the attorney's firm represents one or more of the debtor's creditors in unrelated matters.

Volunteer Lawyers for Justice (VLJ) created a bankruptcy clinic to assist low-income debtors who have no assets to distribute. VLJ enlisted the help of lawyers in the bankruptcy department at Lowenstein Sandler, a large New Jersey law firm that also represents institutional creditors in matters unrelated to VLJ's cases. VLJ and the firm implemented various safeguards to screen for potential conflicts. VLJ first examines each debtor's finances and turns away anyone with assets available for distribution to creditors or an annual income of about $27,500 or more. For debtors who qualify, VLJ gathers the relevant documents, including the names of attorneys or collection agencies that creditors may have hired, and sends the information to a volunteer attorney. The volunteer attorney then conducts a conflict check on each relevant person or entity in the client file before contacting the debtor, confirms that the debtor has no assets available for distribution, and asks the debtor additional questions that may identify conflicts. Attorneys decline to take the case if the firm represents or has represented one of the debtor's creditors in a matter related to the debtor, or if a creditor the firm represents has brought a lawsuit or collection action against the debtor in an unrelated matter. Otherwise, the attorneys generally accept the representation, even if the firm represents one or more of the debtor's creditors in unrelated matters. The firm prepares an engagement letter informing the debtor that the firm will withdraw from representation if a conflict of interest arises and of the scope of the firm's representation. Among other things, the firm prepares and files the debtor's Chapter 7 bankruptcy petition and represents the debtor at a meeting of the creditors, sometimes referred to as a "section 341 meeting," which takes place before any debts may be discharged and gives creditors an opportunity to question the debtor under oath. See 11 U.S.C.A. § 341(a). VLJ represents that no creditors have appeared at the section 341 meetings of any pro bono clients.

Because potential volunteer attorneys were hesitant to participate in the clinic due to possible conflict issues, VLJ sent a formal inquiry to the Advisory Committee on Professional Ethics (ACPE) asking "whether a volunteer pro bono attorney may represent low-income debtors in seeking relief under Chapter 7 of the Bankruptcy Code even if the attorney's firm represents creditors of those debtors in unrelated matters." The ACPE responded in the form of a written opinion. Because this situation does not involve a direct conflict of interest under RPC 1.7(a)(1), the ACPE focused on RPC 1.7(a)(2), which provides that a conflict of interest exists when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." The ACPE could not "find, as a categorical matter, that in all cases there would be no material limitation on the lawyer's representation." The ACPE therefore concluded that volunteer lawyers must inform both clients "of their participation in the program and obtain consent." The Court granted VLJ's petition for review under Rule 1:19-8. 216 N.J. 12 (2013).

**HELD**: VLJ's pro bono bankruptcy program does not present a conflict of interest under RPC 1.7. With appropriate safeguards, a volunteer attorney can represent a low-income debtor in a no-asset Chapter 7 bankruptcy matter even if the attorney's firm represents one or more of the debtor's creditors in unrelated matters.

1. Chapter 7 of the Bankruptcy Code provides a statutory framework to discharge an individual debtor's unpaid debts and to distribute any non-exempt assets among creditors in an equitable way. Many Chapter 7 cases -- like the ones VLJ handles -- are "no-asset" cases in which the debtor has no property to distribute and the creditor may receive nothing. In a typical Chapter 7 case, the debtor files a petition for bankruptcy listing his debts or creditors, which constitutes an order for relief, and the court notifies the debtor's creditors of the order. Within a reasonable amount of time, a trustee convenes a section 341 meeting. The meeting is not a formal judicial proceeding; it is not conducted in court, and the bankruptcy judge may not attend. See 11 U.S.C.A. § 341(c). Although a creditor can file a complaint and object to the discharge of debt, unless a debtor has committed a prohibited act listed in the statute, the discharge is not discretionary. See 11 U.S.C.A. § 727(a). Most Chapter 7 cases, as a result, are straightforward and non-adversarial. (pp. 10-14)

2. A conflict of interest exists under RPC 1.7(a)(2) if there is a "significant risk" that a volunteer lawyer's representation of an indigent client in a Chapter 7 proceeding "will be materially limited by the lawyer's responsibilities" to a creditor the firm represents in an unrelated matter, or vice versa. Because the Court adopted the ABA Model Rules of Professional Conduct, the official ABA comments to those rules can assist in interpreting them. Those comments explain that the "mere possibility of subsequent harm does not itself require disclosure and consent"; instead, there must be "a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Model Rules of Prof'l Conduct R. 1.7 cmt. 8 (2013). To identify such a risk, "[t]he critical questions are the likelihood that a difference in interests" will arise, and "if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." Ibid. (pp. 14-16)

3. Advisory ethics committees in New York and Boston have found that pro bono Chapter 7 bankruptcy programs similar to VLJ's program do not give rise to a conflict of interest. Those decisions noted, among other things, that unlike traditional adversarial lawsuits, Chapter 7 cases proceed by automatic operation of statute to discharge debt absent a creditor's objection, that volunteer lawyers do not represent debtors if a creditor objects to the discharge of a debt or takes some other action against the debtor, and that the volunteer programs utilize procedures to screen out cases that could create a conflict. See The Ass'n of the Bar of the City of N.Y. Comm. on Prof'l and Judicial Ethics, Formal Op. 2005-01 (2005); Bos. Bar Ass'n Ethics Comm., Op. 2008-01 (2008). Ethics opinions from other jurisdictions are distinguishable or do not consider the issue in detail. (pp. 16-21)

4. VLJ's program does not present a conflict of interest under RPC 1.7. The Chapter 7 pre-determined statutory process does not become adversarial unless a creditor files a complaint and objects, which triggers withdrawal of the VLJ volunteer lawyer. The VLJ program screens out directly adverse interests at the outset, and the volunteer lawyers later pose questions designed to root out conflicts. The program also undertakes a thorough effort to ensure that prospective clients are truly indigent and have no assets available for distribution to creditors. As a practical matter, in the "no-asset" cases the clinic handles, there are no non-exempt assets for a debtor to try to shield or a creditor to receive. In addition, the firm notifies debtors at the outset that it will withdraw if a conflict arises, and creditors receive notice that the law firm represents a debtor. The Bankruptcy Court also sends a notice, which identifies the debtor's lawyer, to all creditors listed on the Chapter 7 petition. Fed. R. Bankr. P. 2002(a)(1). Moreover, in an analogous context, the Bankruptcy Code allows court-appointed trustees to hire "disinterested" attorneys for assistance, and expressly states that such attorneys are not disqualified "solely because of [their] employment by or representation of a creditor," unless another creditor or the trustee objects and "there is an actual conflict of interest." 11 U.S.C.A. § 327(a), (c). Under the facts presented in this matter, the Court does not find a "significant risk" that a volunteer lawyer's representation of a Chapter 7 debtor in a no-asset case will be "materially

limited" by the firm's responsibilities to creditors in unrelated matters, or that representation of those creditors will be "materially limited" by the firm's obligations to the debtor.  See RPC 1.7(a)(2).  To the extent the ACPE articulated a different standard, the Court does not follow it.  Finally, although VLJ advises that no creditor has yet appeared at a section 341 meeting to question the debtor, because that circumstance could strain the lawyer's duty of loyalty to either client, even if the creditor chose not to object, the Court finds that another attorney from outside the firm should be substituted to assist the debtor under those circumstances. (pp. 21-24)

5. Because the Court enacted the RPCs in the public interest, the strong policy in favor of pro bono legal services also informs the Court's decision.  Low-income New Jersey residents facing civil legal challenges are often unable to get legal help.  In the Chapter 7 bankruptcy context, a technical area not designed for the layperson, the number of self-represented bankruptcy filings has grown in the wake of the recession, and self-represented litigants have been less successful in getting their debts discharged. The Court commends the lawyers in this and other pro bono initiatives who offer their assistance at a time of need and help bridge the justice gap that leaves many low-income residents in New Jersey without legal services. (pp. 24-28)

The final action of the ACPE is **REVERSED**.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.**

IN THE MATTER OF
OPINION NO. 17-2012
OF THE ADVISORY COMMITTEE
ON PROFESSIONAL ETHICS

Argued April 1, 2014 – Decided July 2, 2014

On petition for review of a decision of the
Supreme Court Advisory Committee on
Professional Ethics.

Catherine Weiss argued the cause for
appellant Volunteer Lawyers for Justice
(Lowenstein Sandler, attorneys; Ms. Weiss
and Joseph A. Fischetti, on the briefs).

Michael C. Walters, Assistant Attorney
General, argued the cause for respondent
Advisory Committee on Professional Ethics
(John J. Hoffman, Acting Attorney General of
New Jersey, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel).

Susan A. Feeney argued the cause for amicus
curiae New Jersey State Bar Association
(Ralph J. Lamparello, President and McCarter
& English, attorneys; Ms. Feeney, Emily B.
Goldberg, and Judah Skoff, on the brief).

Steven R. Marino argued the cause for amici
curiae Pro Bono Institute, Jessica Kitson,
and Jill Friedman (DLA Piper, attorneys).


CHIEF JUSTICE RABNER delivered the opinion of the Court.

This case involves people who have incurred debts, have no

assets to repay them, and want to discharge those debts in

bankruptcy court.  In the years since the recent downturn in the

1

economy, tens of thousands of New Jersey residents have found themselves in that situation.  Because they do not have enough money to pay for a lawyer, too many people have been forced to represent themselves as they navigate the technical field of bankruptcy law.

In response, Volunteer Lawyers for Justice (VLJ), a legal services organization, created a bankruptcy clinic to assist low-income debtors who have no assets to distribute.  VLJ and the volunteer lawyers who work with the group screen potential clients in an effort to avoid conflicts of interest.

A number of volunteer attorneys work at a law firm that also represents large, institutional creditors in unrelated matters.  VLJ represents that other potential volunteers are reluctant to participate in the clinic because of possible ethical objections.

VLJ therefore turned to the Advisory Committee on Professional Ethics (ACPE) for guidance and posed the following question:  can a volunteer lawyer represent a low-income debtor in a Chapter 7 bankruptcy proceeding if the lawyer's firm represents one or more of the debtor's creditors in unrelated matters?  In other words, if a potential pro bono bankruptcy client owes thousands of dollars in credit card debt to a bank, and the bank is a client of the firm in an entirely different

legal matter, can a lawyer at the firm volunteer to represent the debtor in bankruptcy court?

The ACPE concluded that both clients must be informed and "decide whether they consent to waive the conflict." Particularly in light of the nature of Chapter 7 bankruptcy proceedings, and the standards that govern the clinic and pro bono counsel, we do not agree. We do not believe that participation in the program poses a conflict of interest under the Rules of Professional Conduct (RPC). See RPC 1.7(a)(2). As a result, we conclude that this valuable pro bono effort can continue to operate with appropriate safeguards.

## I.

## A.

VLJ provides free legal services to low-income residents of New Jersey on a wide range of civil issues. Since the start of the recent recession, a growing number of people have sought help to discharge debts they cannot pay. To address part of the problem, VLJ and Merck, a pharmaceutical company with an in-house legal staff, established a volunteer bankruptcy clinic in 2009 to assist low-income people prepare and file bankruptcy petitions and to represent them at hearings. The clinic serves indigent clients in Bergen, Essex, Hudson, Morris, Passaic, Sussex, and Union Counties.

In 2010, VLJ and Merck enlisted the help of lawyers in the bankruptcy department at Lowenstein Sandler, a large New Jersey law firm. The firm also represents institutional creditors in matters unrelated to VLJ's cases.

To screen for potential conflicts, VLJ and the firm implemented various safeguards, following the lead of ethics committees in New York City and Boston. Both committees had approved similar pro bono bankruptcy programs that are discussed below.

The clinic operates in the following way. When a debtor considering filing for bankruptcy contacts VLJ, the group initially determines if the person qualifies for its help. The clinic only represents low-income individuals with "no assets" for purposes of Chapter 7 bankruptcy cases. VLJ thus examines each debtor's finances and turns away anyone with assets available for distribution to creditors or an annual income of about $27,500 or more. VLJ sometimes refers debtors with minimal assets to other pro bono attorneys outside the clinic.

For debtors who qualify, VLJ collects the documents needed to file a Chapter 7 petition, including a list of outstanding debts; gathers the names of attorneys or collection agencies that creditors may have hired; and sends the information to a volunteer attorney. Both attorneys and paralegals at VLJ conduct the initial screening.

4

Once volunteer attorneys at the firm receive the information, they conduct a conflict check on each relevant person or entity in the client file before contacting the debtor.  Potential conflicts involving other matters handled by the firm are identified in that way.  The firm, like VLJ, also confirms that the debtor has no assets available for distribution.

Attorneys decline to take the case if the conflict check reveals that the firm represents or has represented one of the debtor's creditors in a matter related to the debtor.  If a creditor the firm represents has brought a lawsuit or collection action against the debtor in an unrelated matter, the attorneys also decline the debtor's case.  Otherwise, the attorneys generally accept the representation, even if the firm represents one or more of the debtor's creditors in unrelated matters.

When volunteer attorneys meet with debtors, they confirm the above conditions.  Consistent with the recommendations of ethics panels in New York City and Boston, the attorneys also ask whether

> the case involves only one creditor; the client has granted any new liens or made any non-routine payments in the past ninety days; any of the debts to be discharged is of a sufficient size that it is likely to have a material impact on the creditor's bottom line; other facts suggest an unusual or disproportionate impact on any particular creditor; and other forms of bankruptcy

relief or alternatives to bankruptcy warrant consideration.

Answers to those questions may identify additional conflicts.

After the conflict check is completed, the firm prepares an engagement letter for the debtor to sign. The letter informs the debtor that the firm will withdraw from representation if a conflict of interest arises, including if a creditor the firm represents objects to the bankruptcy petition or starts an adversary proceeding against the debtor.

The letter also informs the debtor of the scope of the firm's representation. Among other things, the firm will prepare and file the debtor's Chapter 7 bankruptcy petition and represent the debtor at a meeting of the creditors under the Bankruptcy Code, sometimes referred to as a "section 341 meeting." That meeting takes place before any debts may be discharged and gives creditors an opportunity to question the debtor under oath. VLJ represents that no creditors have appeared at the section 341 meetings of any pro bono clients.

As of December 2012, more than fifty volunteer attorneys had represented approximately one hundred pro bono clients through the clinic. VLJ had approached additional lawyers at other firms to recruit them as volunteers. It represents that those attorneys were hesitant to participate in the clinic

6

because they represent creditors in unrelated matters and were concerned about possible conflicts of interest issues.

B.

To clarify the issue, VLJ sent a formal inquiry to the ACPE on December 2, 2012. The ACPE is a committee of the Supreme Court that addresses questions about the "proper conduct" of lawyers under the RPCs. R. 1:19-2. VLJ asked the Committee "whether a volunteer pro bono attorney may represent low-income debtors in seeking relief under Chapter 7 of the Bankruptcy Code even if the attorney's firm represents creditors of those debtors in unrelated matters."

The ACPE responded in the form of a written opinion dated May 10, 2013. It concluded that "lawyers need to inform creditor clients of their participation in the program and obtain consent" before they can represent a debtor who "has obligations to the creditor client."

The ACPE recognized that a lawyer's representation of a debtor in a "no-asset" Chapter 7 bankruptcy case did not create a direct conflict of interest with a creditor. See RPC 1.7(a)(1). The ACPE's opinion letter focused on RPC 1.7(a)(2) instead, which provides that a conflict of interest exists when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client."

7

The Committee observed that although these cases presumably involve small amounts of money, a creditor may object based on "loyalty concerns or other non-monetary interests." According to the ACPE, therefore, the lawyer "could be materially limited by obligations to the creditor client and a conflict would arise." The Committee could not "find, as a categorical matter, that in all cases there would be no material limitation on the lawyer's representation." It noted that "an unreasonable client may have inflated expectations of loyalty"; "that not all clients would be content if their lawyer represents debtors in such proceedings"; and that even if adverse interests are indirect, "there is a risk that the representation will be materially limited." It thus directed volunteer lawyers to inform both clients "of their participation in the program and obtain consent."

We granted VLJ's petition for review of the ACPE's final action under Rule 1:19-8. 216 N.J. 12 (2013). We also granted motions from the New Jersey State Bar Association as well as the Pro Bono Institute, along with two individuals who direct public interest programs at Rutgers School of Law-Newark and -Camden, to appear as amici curiae.

II.

VLJ argues that the ACPE misapplied RPC 1.7(a)(2). The group contends that the ACPE erred in finding a conflict under

8

the rule because there is no "significant risk" that an attorney's pro bono representation of a low-income Chapter 7 debtor will "materially limit" his or her representation of one of the debtor's creditors in an unrelated matter. According to VLJ, the risk of a conflict of interest is remote. VLJ also maintains that the ACPE effectively revived the "appearance of impropriety" standard and failed to take account of the safeguards in the clinic's screening measures and conflicts checks. VLJ points to other ethics opinions in New York City and Boston that have approved nearly identical programs. In addition, VLJ argues that attorneys serve an important public interest when they provide specialized legal services to low-income debtors on a pro bono basis.

The Attorney General, appearing on behalf of the ACPE, argues that the Committee's opinion is correct. The Attorney General notes that the interests of a creditor and debtor in a Chapter 7 bankruptcy may be indirectly adverse and that, in some instances, there may be a significant risk that the lawyer's representation will be materially limited. In addition, the Attorney General suggests that opinions from jurisdictions that require consent from both clients in comparable bankruptcy matters should be given more weight than rulings by ethics committees in New York City and Boston.

The New Jersey State Bar Association (NJSBA) argues that the standard the ACPE articulated is inconsistent with the plain meaning of RPC 1.7(a)(2). The NJSBA also contends that the ACPE failed to consider relevant bankruptcy rules that permit court-appointed trustees to hire lawyers who may represent creditors in unrelated matters. The NJSBA presents other arguments that echo VLJ's position. Among other points, the NJSBA stresses that the ACPE's opinion will have a negative effect on pro bono efforts that are needed to help low-income residents in New Jersey.

The Pro Bono Institute, a non-profit organization that provides research and assistance to legal groups seeking to help the poor and others, and two individuals who oversee public interest programs at Rutgers School of Law-Newark and -Camden, presented a combined brief as amici. They document the need for pro bono representation, nationally and in New Jersey, and the recent increase in pro se Chapter 7 filings. Like VLJ and the NJSBA, amici argue that this lack of representation creates a gap in the administration of justice, which pro bono programs can help close.

III.

We briefly review certain features of federal bankruptcy law to provide context for this matter.

10

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367, 127 S. Ct. 1105, 1107, 166 L. Ed. 2d 956, 961-62 (2007) (citation omitted). Chapter 7 of the Bankruptcy Code provides a straightforward framework (a) to discharge an individual debtor's unpaid debts, to the extent the law allows, and (b) to distribute any non-exempt assets among creditors in an equitable way. Collier on Bankruptcy ¶ 1.07[1][a][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Chapter 7 outlines a mechanism to take control of a debtor's property, sell it, and distribute the proceeds to creditors. Id. at ¶ 1.07[1][a]. But many Chapter 7 cases -- like the ones VLJ handles -- are "no-asset" cases in which the debtor has no property to distribute and the creditor may receive nothing. Id. at ¶ 1.07[1][a][1], -[1][f].

In a typical Chapter 7 case, "the debtor files a petition for bankruptcy in which he lists his debts or his creditors; [and] the petition constitutes an order for relief." Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447, 124 S. Ct. 1905, 1910, 158 L. Ed. 2d 764, 775 (2004) (citations omitted). The court clerk, in turn, "notifies the debtor's creditors of the order." Ibid.

Within a reasonable amount of time, a trustee then convenes and presides over a "meeting of creditors," in accordance with

11

section 341 of the Bankruptcy Code.  11 U.S.C.A. § 341(a).  The debtor must attend the section 341 meeting and "submit to examination" under oath by any creditors that choose to attend. Collier, supra, ¶ 1.07[1][c].  The meeting is not a formal judicial proceeding; it is not conducted in court, and the bankruptcy judge may not attend.  See 11 U.S.C.A. § 341(c).

A creditor can file a complaint and object to the discharge of debt.  See Daniel R. Cowans, Bankruptcy Law & Practice § 5.5 at 68-70 (7th ed. 1998).  The grounds for objection, though, are limited by statute.  See 11 U.S.C.A. § 727(a) (listing, among other grounds, when debtor has transferred, destroyed, or concealed property with intent to defraud, or has knowingly made false oath in bankruptcy case).  In most cases, creditors do not object, see Cowans, supra, § 5.3 at 62; it "can be expensive" to do so, and "not overly productive" to collect from a debtor whose discharge is denied, id. at § 5.4 at 65.

Unless a debtor has committed a prohibited act listed in section 727, the discharge of debt is not discretionary. Rather, "the debtor is entitled to a full discharge and release from all [dischargeable] debts." Collier, supra, ¶ 1.07[1][a][i] (emphasis added) (citations omitted); see also 11 U.S.C.A. § 727(a) (providing that "court shall grant the debtor a discharge," absent listed circumstances (emphasis added)).

Most Chapter 7 cases, as a result, are straightforward and non-adversarial. The structured proceedings, guided by federal law, can be resolved quickly and without disputes. See Berliner v. Pappalardo (In re Puffer), 674 F.3d 78, 80 (1st Cir. 2012). As one bankruptcy judge observed in the context of reviewing a fee application, "the services required in a Chapter 7 case, i.e., the filing of papers and attendance at a § 341 meeting for about five minutes, are, like those performed in an uncontested divorce, among the simplest of non-adversarial legal problems which any lawyer will encounter." In re Patronek, 121 B.R. 728, 734 (Bankr. E.D. Pa. 1990).

Most debtors seek bankruptcy relief under Chapter 7. Collier, supra, ¶ 1.07[1]. In New Jersey, about seventy-five percent of all bankruptcy filings are submitted by individuals under Chapter 7. See Admin. Office of the U.S. Cts., U.S. Bankr. Cts. -- Bus. and Nonbusiness Cases Commenced, by Ch. of the Bankr. Code During the 12-Month Period Ending Mar. 31, 2014, Table F-2, www.uscourts.gov/uscourts/statistics/ bankruptcystatistics/bankruptcyfilings/2014/0314_f2.pdf (last visited June 5, 2014).

A far smaller number of debtors proceed under Chapter 13 of the Bankruptcy Code, ibid., which provides for a very different approach. Under Chapter 13, debtors with a regular income can hold onto their assets and pay off their debt to creditors over

time.  <u>Collier</u>, <u>supra</u>, ¶ 1.07[5][c].  Debts are only discharged once a repayment plan has been completed.  <u>Id.</u> at ¶ 1.07[5][e].  Thus, although Chapter 7 and 13 proceedings have similar aims, they "are poles apart in the means employed" to achieve them.  <u>Id.</u> at ¶ 1300.02.

IV.

We consider the question presented -- whether volunteer lawyers who represent low-income persons in "no asset" Chapter 7 bankruptcy matters have a conflict if their firm represents a creditor in an unrelated matter -- in light of <u>RPC</u> 1.7.  Because the Court has plenary authority to regulate the legal profession in New Jersey, we review this issue de novo.  <u>See</u> <u>N.J. Const.</u> art. VI, § 2, ¶ 3; <u>In re Sup. Ct. Adv. Comm. on Prof'l Ethics Op. No. 697</u>, 188 <u>N.J.</u> 549, 554 (2006); <u>In re LiVolsi</u>, 85 <u>N.J.</u> 576, 585 (1981).

<u>RPC</u> 1.7 provides as follows:

> (a)  Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
>
> > (1)  the representation of one client will be directly adverse to another client; or
>
> > (2)  there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a

14

> third person or by a personal interest of the lawyer.
>
> (b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
>> (1)     each affected client gives informed consent, confirmed in writing, after full disclosure and consultation . . . .

The parties do not suggest that representation of a low-income debtor is "directly adverse" to a creditor that the firm represents in an unrelated matter.  Our focus, therefore, is on section (a)(2).  That clause outlines the proper framework for analysis:  a conflict exists if there is a "significant risk" that a volunteer lawyer's representation of an indigent client in a Chapter 7 proceeding "will be materially limited by the lawyer's responsibilities" to a creditor the firm represents in an unrelated matter, or vice versa.  RPC 1.7(a)(2).

The Court adopted the ABA (American Bar Association) Model Rules of Professional Conduct in 1984 "to harmonize New Jersey's standards with the Model Rules and to provide clear, enforceable standards of behavior for lawyers."  State v. Rue, 175 N.J. 1, 14 (2002).  The official ABA comments to the RPCs can assist in interpreting them.  Introduction to Rules of Professional Conduct, Kevin H. Michels, New Jersey Attorney Ethics, Appendix A2 at 1257 (2014).

Comment 8 to the relevant model rule addresses what constitutes a significant risk of a material limitation. See Model Rules of Prof'l Conduct R. 1.7 cmt. 8 (2013). The comment explains that the "mere possibility of subsequent harm does not itself require disclosure and consent." Ibid. Instead, there must be "a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Ibid. To identify such a risk, "[t]he critical questions are the likelihood that a difference in interests" will arise, and "if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." Ibid. For example, an attorney "asked to represent several people seeking to form a joint venture is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the others." Ibid.

Lawyers are called upon to make the above determination whenever they consider representing a new client with a connection to another client. RPC 1.7 requires counsel to exercise professional judgment about the possibility of a

concurrent conflict under the circumstances; the rule does not require attorneys to notify a client and get consent <u>unless</u> there is a significant risk that one client's interests will materially limit the lawyer's obligations to the other.

V.

Advisory committees in other states have considered comparable programs, and two of them have approved pro bono Chapter 7 bankruptcy initiatives similar to the clinic's efforts.

In New York City, the Bar Association's Committee on Professional and Judicial Ethics considered a nearly identical pro bono program. <u>See</u> The Ass'n of the Bar of the City of N.Y. Comm. on Prof'l and Judicial Ethics, Formal Op. 2005-01, 1 (2005). It concluded that, under certain conditions, volunteer lawyers from large commercial law firms could simultaneously represent both low-income debtors in Chapter 7 bankruptcy cases, and their creditors in unrelated matters, without giving rise to a conflict of interest. <u>Id.</u> at 1, 8.

The opinion observed that Chapter 7 proceedings are "[u]nlike the commencement of litigation -- which by definition is brought directly against one or more parties on behalf of another party with an adverse interest." <u>Id.</u> at 5. "[A] typical Chapter 7 case," by contrast, "is an <u>in rem</u> proceeding that triggers the automatic operation of a statutory framework

17

for marshaling and distributing assets and discharging debt."
Ibid. Absent an objection, debts are discharged "by automatic
operation of statute." Ibid. The committee noted that "there
is no adversity between debtor and creditor" under the relevant
ethical rules "unless and until a creditor objects." Id. at 6.
It also considered "adversity of an indirect nature." Ibid.

The committee explained that its analysis might be
different under other circumstances: if the prospective client
were involved in litigation or a dispute with a client of the
firm; if the firm represented institutional clients in consumer
collection actions; if the debtor "had no non-exempt assets and
only a single creditor" that the firm represented, in which case
the filing of a Chapter 7 petition could appear to be "more
directly aimed at that particular creditor"; if the debtor "had
granted new liens . . . or made nonroutine payments within the
past 90 days"; or if the "client's personal circumstances made
it advisable for him or her to consider . . . forms of
bankruptcy relief" other than Chapter 7. Id. at 6-7. As noted
above, VLJ's clinic seeks to avoid handling those types of
cases.

In addition, the committee concluded that if a creditor
objects to the discharge of a debt, or takes some other action
against the debtor, the volunteer lawyer "cannot represent the

18

debtor" without getting "any necessary consent." Id. at 8. The clinic follows that approach as well.

Three years later, the Boston Bar Association's Ethics Committee approved a similar pro bono bankruptcy initiative. Bos. Bar Ass'n Ethics Comm., Op. 2008-01, 1 (2008). The committee found that, "[a]bsent special circumstances, . . . the proposed representation does not give rise to a conflict of interest" under a rule comparable to RPC 1.7. Id. at 10.

Like the New York opinion, the Boston committee remarked that "in ordinary circumstances a Chapter 7 Petition is not directed 'against' any particular creditor. Thus [it] is not like filing a lawsuit on behalf of one creditor against another creditor" or "a debtor against a creditor." Id. at 5. The committee also compared volunteer lawyers to attorneys appointed by a bankruptcy trustee "'who have multiple representations involving creditors and the debtor'" in unrelated matters. Id. at 6-7 (quoting 1 Collier on Bankruptcy ¶ 8.03[9][b] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (citing 11 U.S.C.A. § 327)).

In addition, the committee credited the initiative for taking "appropriate steps to identify and avoid any special circumstances where the lawyer's ability to act could be materially limited." Id. at 9-10. Under Boston's program, volunteer lawyers are to ask questions to screen new clients for

possible conflicts.  Ibid.  VLJ's initiative requires this as well.

Other ethics opinions are distinguishable or do not consider the issue in detail.  The North Carolina Bar, for example, does not permit attorneys to represent a debtor in a Chapter 13 bankruptcy case if they represent a lender in other matters, without the consent of both clients.  See N.C. State Bar, Formal Ethics Op. 11 (2010).  But Chapter 13 proceedings, which seek to preserve the debtor's assets and involve potentially lengthy repayment plans between debtors and creditors, present different concerns than Chapter 7 cases do.

The Oregon State Bar Association has opined that a lawyer may not simultaneously represent a debtor and creditor in the same bankruptcy proceeding.  Or. State Bar Ass'n, Formal Op. No. 2005-40 (2005).  It also stated that a lawyer would need consent from both clients to represent the debtor in bankruptcy court if the creditor was a client in an unrelated matter.  Ibid.  The opinion offers no analysis and does not identify the type of bankruptcy proceeding involved.

Finally, New York's Suffolk County Bar Association opined in 1991 that lawyers could not represent a debtor in an unspecified type of bankruptcy proceeding if the lawyer also represented a creditor in an unrelated case.  Suffolk Cnty. Bar Ass'n, Op. 91-1 (1991).  The brief opinion also contains little

analysis and refers, in part, to an outdated standard:  the need to avoid an appearance of impropriety.  Id. at 1; see also In re Op. 697, supra, 188 N.J. at 552.

VI.

We consider VLJ's program in light of RPC 1.7.  We conclude that the program does not present a conflict of interest under the rule for a number of reasons.

To begin with, the nature of Chapter 7 proceedings makes it less likely that a difference of interests between debtors and creditors will develop.  Model Rules of Prof'l Conduct R. 1.7, supra, cmt. 8.  As discussed earlier, a Chapter 7 proceeding is not a lawsuit between a debtor and creditor.  When a Chapter 7 petition is filed on behalf of a debtor, that triggers a pre-determined statutory process to liquidate assets and discharge outstanding debts.  See Cowans, supra, § 5.3 at 62.  The process does not become adversarial unless someone -- in particular a creditor -- files a complaint and objects.  See id.; Patronek, supra, 121 B.R. at 734.  If that happens, a volunteer lawyer in the VLJ program withdraws from assisting the debtor if the lawyer's firm also represents the creditor.

The safeguards built into VLJ's initiative also minimize the risk of a conflict of interest.  The program screens out directly adverse interests at the outset, such as when a firm represents a creditor in a matter related to the bankruptcy, or

21

the creditor has brought a lawsuit or collection action against the debtor in an unrelated case.  Volunteer lawyers also pose questions designed to root out cases that may be of particular importance to a creditor.  They screen for cases that involve only one creditor or debts that are sufficiently large that they would likely have a material impact on a creditor's bottom line.

In most cases, those concerns do not surface.  For large institutional creditors, like banks or cell phone service providers, the amount of debt in a typical Chapter 7 case is not significant to the company as a whole.  For smaller creditors as well, it often costs more than the value of the debt to send a representative to a section 341 meeting or challenge the discharge.  See Cowans, supra, § 5.4 at 65.

Another important part of the screening process is a thorough effort to ensure that prospective clients are truly indigent.  VLJ only represents people with an income up to 175% of the federal poverty level -- about $27,500 for a family of two.  VLJ also screens out individuals who have assets available for distribution to creditors.  Volunteer attorneys at the firm conduct the same review a second time.

The issue before the Court relates only to "no-asset" Chapter 7 bankruptcy filing.  We do not address Chapter 7 petitions in which there are assets to distribute or proceedings under any other chapter of the Bankruptcy Code.  As a practical

matter, in the "no-asset" cases the clinic handles, there are no non-exempt assets for a debtor to try to shield or a creditor to receive.

There are also two forms of notice to clients. The firm tells debtors at the outset that it will withdraw if a conflict arises, for example, in the unlikely event a creditor it represents objects to the petition. Creditors also receive notice that the law firm represents a debtor. The Bankruptcy Court sends a notice, which identifies the debtor's lawyer, to all creditors listed on the Chapter 7 petition. Fed. R. Bankr. P. 2002(a)(1). We do not suggest that this type of notice, by itself, constitutes a waiver in this or other contexts.

In addition, we note that the Bankruptcy Code, in an analogous context, allows court-appointed trustees to hire "disinterested" attorneys to help carry out the trustee's duties. 11 U.S.C.A. § 327(a). The Code expressly states that attorneys are not disqualified "solely because of [their] employment by or representation of a creditor," unless another creditor or the trustee objects and "there is an actual conflict of interest." 11 U.S.C.A. § 327(c). As one authoritative treatise has noted, the "Bankruptcy Code contemplates that attorneys will, in unrelated matters, have multiple representations involving creditors and the debtor." Collier, supra, ¶ 8.03[9][b] (discussing 11 U.S.C.A. § 327(c)).

To be sure, some creditors who are clients of the firm may be less than pleased by a lawyer's volunteer activities on behalf of a debtor. But that is not the standard to determine whether a conflict of interest exists. See RPC 1.7(a)(2). The "mere possibility" of harm, let alone displeasure, does not require consent. Model Rules of Prof'l Conduct R. 1.7, supra, cmt. 8. Under the facts presented in this matter, we do not find a "significant risk" that a volunteer lawyer's representation of a Chapter 7 debtor in a no-asset case will be "materially limited" by the firm's responsibilities to creditors in unrelated matters, or that representation of those creditors will be "materially limited" by the firm's obligations to the debtor. See RPC 1.7(a)(2). To the extent the ACPE articulated a different standard, we do not follow it.

VLJ reports that in the four-year history of the clinic, no creditor has objected to the discharge of a client's debt in the one hundred cases handled so far. Once again, if a creditor were to object to the discharge, VLJ would arrange for another volunteer attorney outside the firm to handle the case. Just the same, VLJ advises that no creditor has yet appeared at a section 341 meeting to question the debtor. If that happened, it could strain the lawyer's duty of loyalty to either client, even if the creditor chose not to object. As a result, we find

24

that another attorney from outside the firm should be substituted to assist the debtor under those circumstances.

                              VII.

This Court "enacted the RPCs with the public interest as a paramount consideration." Borteck v. Riker, Danzig, Scherer, Hyland & Perretti, LLP, 179 N.J. 246, 259 (2004).  The strong policy in favor of pro bono legal services therefore informs our decision as well.

Volunteering one's time and expertise to help people who need legal services that they cannot afford is in keeping with the finest traditions of the practice of law.  See In re Guardianship of G.S., III, 137 N.J. 168, 175 (1994); Madden v. Delran, 126 N.J. 591, 595 (1992).  That noble tradition spans centuries.

During the Reconstruction Era, the Freedmen's Bureau arranged for private lawyers from the District of Columbia and some southern states to assist poor African-Americans in criminal and civil cases.  Jeremy Miller with Vallori Hard, Pro Bono: Historical Analysis and a Case Study, 21 W. St. U. L. Rev. 483, 488 (1994).  In 1876, the first legal aid society in America, later known as the New York Legal Aid Society, began to assist poor German immigrants in landlord-tenant disputes and other civil matters.  See Marlene Coir, Pro Bono and Access to Justice in America: A Few Historical Markers, 90 Mich. B.J. 54,

54 (2011).  During the civil rights movement more than seventy-five years later, local bar associations worked with legal aid groups to help offer services.  See id. at 55.  And in recent years, large, private law firms "have become crucial drivers" of pro bono efforts, as this appeal shows.  Scott Cummings & Rebecca Sandefur, Beyond the Numbers: What We Know--and Should Know--About American Pro Bono, 7 Harv. L. & Pol'y Rev. 83, 84 (2013) (noting that pro bono hours at two hundred largest law firms have increased nearly eighty percent from 1998 to 2005).

New Jersey's Rules of Professional Conduct specifically address pro bono service.  RPC 6.1 declares that

> [e]very lawyer has a professional responsibility to render public interest legal service.  A lawyer may discharge this responsibility by providing professional services at no fee or a reduced fee to persons of limited means or to public service or charitable groups or organizations, by service in activities for improving the law, the legal system or the legal profession, and by financial support for organizations that provide legal services to persons of limited means.

This obligation has even greater meaning today.  Low-income residents in New Jersey who face civil legal challenges are often unable to get legal help.  Legal Services of New Jersey, New Jersey's Civil Legal Assistance Gap 4 (2012), available at www.lsnj.org/PDFs/NJ_Civil_Legal%20Assistance_Gap_2012.pdf (reporting that fewer than one in six low-income residents can

26

secure needed legal assistance for civil problems).  In mortgage foreclosure cases, evictions, immigration matters, and other areas, too many people have to respond to important legal challenges without the help of a lawyer.

The same is true for the growing number of bankruptcies in the wake of the recession.  More than 1.3 million bankruptcies were filed nationwide during the one-year period ending March 31, 2012.  United States Courts, President Signs Temporary Bankruptcy Judgeships Extension Act (May 31, 2012), http://news.uscourts.gov/president-signs-temporary-bankruptcy-judgeships-extension-act.  That amounted to more than 400,000 additional filings compared to the same period in 2008.  Id. The growth in self-represented filings has been even greater. During the five-year period from 2006 to 2011, pro se Chapter 7 filings increased 208% nationally.  United States Courts, By the Numbers--Pro Se Filers in the Bankruptcy Courts (Oct. 2011), www.uscourts.gov/news/TheThirdBranch/11-10-01/By_the_Numbers--Pro_Se_Filers_in_the_Bankruptcy_Courts.aspx.

Chapter 7 of the Bankruptcy Code is a technical area not designed for the layperson.  Not surprisingly, self-represented litigants are less successful in getting their debts discharged under Chapter 7 than debtors who are represented by lawyers.  A survey of Chapter 7 filings in 2007 revealed that "17.6 percent of unrepresented debtors had their cases dismissed or converted"

but "only 1.9 percent of debtors with lawyers met this fate." Angela Littwin, The Affordability Paradox: How Consumer Bankruptcy's Greatest Weakness May Account for its Surprising Success, 52 Wm. & Mary L. Rev. 1933, 1971-72 (2011).

Programs like VLJ's clinic help address this crisis, as volunteer lawyers try to pave the way for debtors to recover financially. We commend the lawyers in this and other pro bono initiatives who offer their skill and help at a time of need. By doing so, they help bridge the justice gap that leaves many low-income residents in New Jersey without legal services.

## VIII.

For the reasons stated above, we reverse the ACPE's final action. We conclude that volunteer attorneys can continue to represent low-income debtors in no-asset Chapter 7 bankruptcy matters consistent with the principles outlined above.

JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.

SUPREME COURT OF NEW JERSEY

NO.     A-22                    SEPTEMBER TERM 2013

DISPOSITION On petition for review of a decision of the
Supreme Court Advisory Committee on Professional Ethics

IN THE MATTER OF
OPINION NO. 17-2012
OF THE ADVISORY COMMITTEE
ON PROFESSIONAL ETHICS

DECIDED              July 2, 2014
               Chief Justice Rabner        PRESIDING
OPINION BY             Chief Justice Rabner
CONCURRING OPINION BY
DISSENTING OPINION BY

| CHECKLIST | REVERSE | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRIGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |

1